# SPIVEY v. ST. THOMAS HOSPITAL.—
## 211 S. W. (2d) 450.

Middle Section. November 1, 1947.

Petition for Certiorari denied by Supreme Court, March 5, 1948.

Rehearing denied by Supreme Court, May 3, 1948.

14

Roberts & Roberts and Z. T. Osborn, all of Nashville, for plaintiff.

Manier & Crouch and J. Olin White, all of Nashville, for defendant.

FELTS, J. Mrs. Spivey sued St. Thomas Hospital for alleged negligence causing the death of her husband, Jesse James Spivey. He was suffering with pneumonia and a high temperature. He was brought to the hospital,

accepted as a paying patient, and put on a bed near a window on the third floor. A few hours later, while delirious with fever and knowing not what he was doing, he got out this window, fell about 14 feet, struck a concrete porch, and his death ensued next day.

The negligence alleged was that through its interns and nurses—its employees and agents—defendant knew he was delirious and irrational and, if left unattended, would likely get out of bed and harm himself; that with this knowledge it undertook to keep him in bed and give him proper care by its interns and nurses; and that it failed to give him proper care, but left him unattended near this unguarded window, let him in his delirium fall or jump out, and thereby caused his death.

It was further alleged that defendant failed to have enough nurses in attendance, failed to keep someone in the room with him, failed to install some device at this window to prevent him from falling through it, failed to use restraints to keep him in bed, or at least did not use them in a proper or sufficient manner, and did not secure the fastenings or other means to prevent him from leaving his bed. Defendant pleaded not guilty.

The case was tried before the judge and a jury. At the close of plaintiff's evidence defendant moved for a directed verdict, which motion was overruled. Defendant did not stand on its motion, but put in evidence by its witnesses to negative negligence and show the death was an unavoidable accident. At the close of all the evidence defendant moved for a directed verdict, which motion was likewise overruled. The jury rendered a verdict for plaintiff for $20,000. The judge aproved the verdict and entered judgment upon it.

Defendant appealed in error and has assigned a number of errors. Its first insistence is that there was no

evidence to support a verdict for plaintiff, that its evidence established beyond dispute that it was guilty of no negligence and the event was altogether unforeseeable and unavoidable, and that a verdict should have been directed for it at the close of all the evidence.

Learned counsel sharply differ in their views of the evidence. It is not for us, however, to settle such differences. That was for the jury. They rendered a general verdict for plaintiff, and we must take it as settling most of such differences in her favor. We have to decide only whether the circumstances of the case for plaintiff were sufficient, in point of law and reason, to permit the jury to find a verdict for her. Whirley v. Whiteman, 38 Tenn. 610, 616; Thayer on Evidence, 208-227, 234-250; Tyrus v. Railroad, 114 Tenn. 579, 594, 86 S. W. 1074, 1077; Brenizer v. N. C. & St. L. Ry., 156 Tenn. 479, 3 S. W. (2d) 1053, 8 S W. (2d) 1099; Osborn v. City of Nashville, 182 Tenn. 197, 201, 204, 185 S. W. (2d) 510, 512.

And in so deciding, we must look to all the evidence, construe it most favorably to plaintiff, take as true that which tends to support her right, discard all countervailing evidence, and from the rest of it allow all reasonable inferences to uphold the verdict. Wildman Mfg. Co. v. Davenport Hosiery Mills, 147 Tenn. 551, 249 S. W. 984; Osborn v. City of Nashville, supra; Poole v. First Nat. Bank of Smyrna, Tenn. App., 196 S. W. (2d) 563; Sepaugh v. Methodist Hospital, Tenn. App., 202 S. W. (2d) 985, 989.

Upon such a view of the evidence, we summarize the circumstances tending to support the case for plaintiff. Defendant is an eleemosynary corporation operating a general hospital in Nashville for the care of the sick.

For this purpose it employs a resident physician, several interns, and a large number of nurses and student nurses. It accepts both charity patients and paying patients. Jesse James Spivey was 26 years of age, a veteran of World War II, and had a wife and a three-months-old child.

He and his wife and child lived on a farm near Gainesboro. About February 1, 1946, he became ill with pneumonia. His condition grew worse and at times his temperature was so high that he would be delirious, not know what he was doing, and try to get out of bed. That he might have better care, he was brought in an ambulance to St. Thomas Hospital. His brother, Clayton Spivey, and his brother-in-law, Luther Trisdale, rode in the back part of the ambulance with him. During most of this journey he was irrational.

They arrived at the hospital about 6:00 P. M. February 4. His brother went to defendant's office, arranged for his admission, and paid defendant's charges for a week in advance. He was taken from the ambulance to Room 309, on the third floor, and put on the bed nearest the window. There was another bed in the room but no patient in it.

Some of defendant's employees telephoned Dr. J. D. Lester, a prominent Nashville physician, to whom one of Spivey's local doctors had referred him, and who usually had a large number of patients in the hospital. Dr. Lester said he would see Spivey later that evening along with his other patients there, and he told the resident physician to begin giving Spivey the routine treatment for pneumonia cases. Defendant's interns and nurses did this.

Spivey's temperature when he was admitted was 106, which is "a very high fever." Its effect was to make him delirious, not know what he was doing, and try to get out of bed and leave. There was conflict in the evidence as to his condition during his first few hours in the hospital. Defendant's nurses said he was perfectly rational, but his brother and his brother-in-law said he was not, and we must assume the jury accredited the latter. Banks v. Southern Potteries, Inc., Tenn. App., 204 S. W. (2d) 382.

The window was about two or three feet from his bed. The bottom of it was about the same height as the bed. Its lower sash was movable, unfastened, and unprotected. It is true there was sharp conflict in the evidence as to whether there was a screen outside this window. Defendant's nurses said there was a screen, and those on duty at the time of the accident said the screen was latched. But Clayton Spivey testified quite positively to the contrary. He said he noticed the window that night and looked at it again next day, and there was no screen.

He and Trisdale stayed that night in the room with the patient until about 8:30 or 9:00. During part of this time he was delirious, "not at himself," and he tried to get up, sat up in bed, and his brother "got hold of him and got him to lay back down." About 8:30 the the nurse in charge turned out the hall light, came into Spivey's room, and told his brother and brother-in-law visiting hours were over and they would have to leave. His brother insisted on staying with him, and told the nurse he had tried to get out of bed and "he would get out of bed and leave if somebody didn't stay in there with him."

Here again there was conflict in the evidence. The nurse said she told them visiting hours were over, and

when they insisted on staying, she told them she would get permission for one to stay, but the other would have to leave. Clayton Spivey, however, testified that she said both would have to go.

Trisdale did go down and wait on the first floor, but Clayton still stayed in the room. About 9:20 or 9:30, he said, the nurse came back and told him under the rule of the hospital he would have to leave. He wanted to stay till Dr. Lester came and talk to the doctor about getting a special nurse. But the nurse said he could stay no longer. He again told her his brother "would get out of bed if somebody didn't watch him." She said: "I will tie him in bed if he tries to get up; I will keep him in bed some way." Then the brother and brother-in-law left the hospital.

The only evidence as to the rest of the circumstances comes from defendant's witnesses. Dr. Lester came about 10:00 or 10:30. He made a cursory examination, he said, and found Spivey rational, his fever down to 102, and his condition very good. The night supervisor of nurses said the doctor told her that the patient was doing well and would be all right till morning.

This supervisor and the nurses were relieved about 11:00 by another supervisor, Mrs. Short, and two student nurses, Miss Mitchell and Miss Wiggins. Each of these student nurses had charge of a section of the third floor, with about fifteen patients each. In each section there was a nurse's station where the charts of the patients were kept and where there was a signal showing when any patient called for the nurse. Each nurse stayed at her station, keeping the charts and watching for the signals, when not going on her rounds answering calls or checking on patients.

These two nurses alternated in checking on Spivey. They checked on him about every ten minutes while he was being given an intravenous solution of glucose. This was stopped about 12:15, and Miss Mitchell, the student nurse in charge of his section, said she ''fixed him comfortable for the night.'' About 1:00 she checked on him again and he was restless and tossing. These two nurses put up sideboards to his bed to keep him from falling out. The supervisor, Mrs. Short, got an order from an intern permitting the nurses to give Spivey a hypodermic dose of sodium luminal to make him sleep.

In addition to the sodium luminal they also gave him aspirin and an alcohol bath. But by 2:30 he was more restless, his fever was 105.8, and the nurses saw he ''wasn't rational,'' ''didn't know what he was doing.'' The supervisor told them to put him in restraints to keep him from getting out of bed. The restraints were two leather straps buckled around his ankles and buckled to the foot of the bed, and two canvas straps tied around his wrists and tied under the bed.

The use of such restraints appears to be a common practice in hospitals when patients are in danger from delirium and such restraints are necessary to protect them from getting out of bed and harming themselves. This had been part of the training of these two young nurses. But when they undertook to put the restraints on Spivey, he was so irrational and violent that they had to call two orderlies, two strong Negro men, to help Miss Wiggins hold him while Miss Mitchell put on the restraints. It took all of them from about 2:30 to about 3:00 to do this. They also tied a canopy sheet over his bed.

These two nurses said they alternately checked on him about every five or ten minutes. That is, they would go

to his door and peep in. They said the restraints were in order and the patient seemed to be quiet. Mrs. Short, the supervisor, said she saw him at 3:20, and he was in full restraint and apparently sleeping.

About 3:45, Miss Wiggins said, while coming from the kitchen down the hall by Spivey's room, she saw him "out of bed, with his arms out of restraints but his feet were still in restraints." She said he was not "fumbling with the buckles or trying to get them loose"; "he was just sitting there looking out in the hall." She called to Miss Mitchell that he was out of bed, and she ran down the hall for an orderly. One of the orderlies was on the fourth floor and the other was operating the elevator.

At the moment of this call Miss Mitchell was standing in front of her chart room door, only about 25 feet from the door to Spivey's room. She said she ran to his door, saw him "standing by the bed." She ran back to the telephane and called Mrs. Short, who was operating the switchboard, to send help. She said she ran back to Spivey's door "to help them keep him from coming out in the hall because he had made the statement he would kill us if he ever got his hands on us." Just as she got to the door, she said, she saw "him going out the window"—"saw his feet."

As stated, the lower sash of the window was movable, unfastened, and unprotected. It had a latch or lock to fasten it down, but "the window wasn't locked." After the accident the window was not broken; its bottom sash was up. One end of each of the leather ankle straps was still buckled to the foot of the bed; but none of defendant's witnesses was able to state whether the other end of these straps had been unbuckled or was still buckled.

As for the canvas straps, which these young nurses said were tied underneath the bed so he couldn't reach down to untie them—both of these "had come loose from the bed." The other end of one of these straps was still tied around Spivey's arm, while the other strap was found on the ground beneath the concrete porch upon which Spivey fell.

He fell about 14 feet, and his head and other parts of his body struck the concrete porch. As soon as his body was found, he was taken to the emergency room, and Dr. Lester was called. But nothing could be done for him. He was suffering from a brain trauma and a cerebral hemorrhage; he was unconscious and in a deep coma. He never regained consciousness, but died next day—about 2:00 A. M. February 6.

■ These circumstances, we think, were sufficient to raise a duty upon defendant to take care to protect its patient Spivey against the risk of getting out of bed and harming himself. It is true some cases, in dealing with the duty of a hospital to its patient, distinguish between a hospital operated for private gain and one conducted as a charity or not for profit. This seems a survival from the old English doctrine of nonliability of trustees of a charity for damages. Feoffees of Heriot's Hospital v. Ross (1846) 12 Clark and Finnelly 507, 8 Eng. Reprint 1508. But now in England a hospital operated as a charity is liable for the negligence of its servants in the same way as a private individual. Hillyer v. The Governors of St. Bartholomew's Hospital, 1909, 2 K. B. 821, 823; Powell and Wife v. Streatham Manor Nursing Home, 1935 A. C. 243.

■ This is true in this state. In testing a hospital's liability for negligence, there is no distinction between

one operated for private gain and one conducted as a charity. The only immunity allowed the latter is that such of its property as is used exclusively for charitable purposes is exempt from execution under a judgment for tort. Baptist Memorial Hospital v. Couillens, 176 Tenn. 300, 140 S. W. (2d) 1088; Anderson v. Armstrong, 180 Tenn. 56, 171 S. W. (2d) 401; James v. Turner, 184 Tenn. 563, 201 S. W. (2d) 691; O'Quin v. Baptist Memorial Hospital, 184 Tenn. 570, 201 S. W. (2d) 694, 697.

In O'Quinn v. Baptist Memorial Hospital, supra, our Supreme Court stated the duty of such a hospital in these words: "The general rule is that a hospital is required to exercise such reasonable care toward a patient as his known condition may require, and the extent and character of this care depends upon the circumtances of each case. 41 C. J. S., Hospitals, Sec. 8, page 349."

Here Spivey's condition was fully known by defendant's nurses and interns. He was suffering from pneumonia and a very high fever, was so irrational as to be violent, and wanted to get out of bed and leave. They had refused to let his brother stay with him and watch him, or stay to see the doctor about getting a special nurse for him. They realized he was in danger from his delirium, said they would tie him if he tried to get up, and by restraints undertook to keep him from getting out of bed and harming himself.

Despite this danger they failed to keep someone in his room to watch him, but left him in his delirium but a step from this unfastened and unguarded window, and failed to fasten the restraints securely or at least to see that the restraints did not come loose. And after they saw him free of the restraints and out of bed, they did

nothing effectual to get him back in bed or to protect him in his helplessness from falling or jumping out the window.

It is urged for defendant, however, that they said they securely fastened the restraints and continually watched to keep them fastened, and that their testimony must be taken as true. But the admitted fact is that the restraints did come loose, which could hardly have happened if they had been properly fastened and if these witnesses had continually watched to keep them fastened. We think their credibility was a matter for the jury.

■ We think the jury could have reasonably found that defendant failed to exercise ordinary care and was negligent in several of the particulars alleged: in failing to keep someone in his room to watch him, in view of its actual knowledge of his danger from his condition; in leaving him unattended in such condition only two or three feet from the unfastened and unguarded window; and in failing to fasten the restraints securely or at least to see that they did not come loose so as to permit him to get up and get out of this window.

■ To say the least, there was room for reasonable minds to differ as to whether defendant was negligent in these particulars. This being so, the questions were for the jury. ''When a given state of facts is such as reasonable men may fairly differ upon the question as to whether there was negligence or not, the determination of the matter is for the jury. It is only where the facts are such that all reasonable men must draw the same conclusions from them that the question of negligence is ever considered one of law for the court.'' Knoxville Traction Co. v. Brown, 115 Tenn. 323, 329, 330, 89 S. W. 319, 321.

Learned counsel for defendant, however, contend that the patient's act of jumping out the window was so unusual and extraordinary that it was altogether unforeseeable, that it was only a possibility and not a probability, and that defendant cannot be charged with negligence for not foreseeing and guarding against such an act.

Some cases do say foreseeableness is not only the measure of duty—the test of negligence—but also the measure of liability for damage caused by the breach of duty. But they rarely in practice apply this double test of foreseeableness. If they did, few, if any, defendants would ever be held for ordinary negligence, because accidents almost invariably are surprises, in the sense that the precise manner of their occurrence cannot be foreseen.

The majority of the well-considered cases, we think, apply foreseeableness only as a test of negligence: whether defendant's conduct created an unreasonable risk of harm to plaintiff. If it did, such cases hold defendant liable for all the injuries within the reasonable range of such risk, whether they could have been foreseen or not. Inter-City Trucking Co. v. Daniels, 181 Tenn. 126, 131, 178 S. W. (2d) 756, 758; Smith v. London S. & W. Ry. Co., L. R. 6 C. P. 14; In re Polemis and Furness Withy & Co., (1921) 3 K. B. 560; Beven on Negligence (4th Ed.) 89, 94; 1 Street, Foundations of Legal Liability, 111-116; Prosser on Torts, 340, 351; see Jeremiah Smith, Legal Cause in Actions of Tort, 25 Harvard Law Review 103, 223, 303, Selected Essays on the Law of Torts, 649-729.

It is often said that a negligent defendant is liable for all the natural and probable consequences of his wrong, irrespective of whether he could have foreseen them or

not. But here the word "probable", if used in its usual sense, is misleading. That is, if used in the sense that the chances in favor of the occurrence outnumber the chances against it. In this connection Professor Prosser, after stating generally that no one can be expected to guard against events which are not reasonably to be anticipated, or are so unlikely that the risk would be commonly disregarded, says this:

"On the other hand, if the risk is an appreciable one, and the possible consequences are serious, the question is not one of mathematical probability alone. The odds may be a thousand to one that no train will arrive at the very moment that an automobile is crossing a railway track, but the risk of death is nevertheless sufficiently serious to require the driver to look for the train. As the gravity of the possible harm increases, the apparent likelihood of its occurrence need be correspondingly less." Prosser on Torts, 221-2.

We quote below some excerpts from judges and legal scholars upon the point now under consideration.

" 'Probable,' both in testing the duty to use care and in the alleged rule as to causation, does not mean 'more likely than not,' but rather 'not unlikely'; or, more definitely, 'such a chance of harm as would induce a prudent man not to run the risk; such a chance of harmful result that a prudent man would forsee an appreciable risk that some harm would happen.' Mr. Watson substitutes 'possible of occurrence' for the phrase 'likely to occur.' Shearman & Redfield use the words 'reasonably possible,' instead of 'probable.' " Jeremiah Smith, "Legal Cause in Actions of Tort," Selected Essays on the Law of Torts, 662-663.

"If there is a substantial likelihood that certain conduct, when pursued by the defendant, will result in some appreciable harm to the plaintiff's person, then the defendant, if he so conducts (sic), cannot escape liability on the ground that he could not foresee the precise manner in which the harm would occur, nor the exact nature of the harm, nor the full extent of such harm. What must be foreseen, in order to establish negligence, is 'harm in the abstract, not harm in the concrete.' The defendant need not foresee 'that an injury should occur in the exact way or to the same extent as that which did occur.' He need only foresee that some injury of a like general character is not unlikely to result from failure to use care." Jeremiah Smith, "Legal Cause in Actions of Tort," Selected Essays on the Law of Torts, 690.

"It was not necessary that the defendant should have had notice of the particular method in which an accident would occur, if the possibility of an accident was clear to the ordinarily prudent eye. Washington & G. R. Co. v. Hickey, 166 U. S. 521, 526, 527, 17 S. Ct. 661, 41 L. Ed. 1101, 1103, 1 Am. Neg. Rep. 758." Holmes, J., in Munsey v. Webb, 231 U. S. 150, 156, 34 S. Ct. 44, 45, 58 L. Ed. 162, 166.

"The risk reasonably to be perceived defines the duty to be obeyed, and risk imports relation; it is risk to another or to others within the range of apprehension. Seavey, Negligence, Subjective or Objective, 41 H. L. Rev. 6; Boronkay v. Robinson & Carpenter, 247 N. Y. 365, 160 N. E. 400. This does not mean, of course, that one who launches a destructive force is always relieved of liability, if the force, though known to be destructive, pursues an unexpected path. 'It was not necessary that the defendant should have had notice of the particular

method in which an accident would occur, if the possibility of an accident was clear to the ordinarily prudent eye.' Munsey v. Webb, 231 U. S. 150, 156, 34 S. Ct. 44, 45, (58 L. Ed. 162); Condran v. Park & Tilford, 213 N. Y. 314, 345, 107 N. E. 565; Robert v. U. S. E. F. Corp., 240 N Y. 474, 477, 148 N. E. 650.'' Cardozo, C. J., in Palsgraf v. Long Island R. R. Co., 248 N. Y. 339, 344, 162 N. E. 99, 100, 59 A. L. R. 1253.

'' 'The logical rule in this connection, the rule of common sense and human experience as well (if, indeed, there can be a difference between a logical doctrine and one of common sense and experience, as some authorities appear to hold), is that a person guilty of negligence should be held responsible for all the consequences which a prudent and experienced man, fully acquainted with all the circumstances which in fact existed, whether they could have been ascertained by reasonable diligence or not, would, at the time of the negligent act, have thought reasonably possible to follow, if they had occurred to his mind. 1 Sher. R. Neg., Sec. 29.' '' Smith, Sp. J., in Jackson v. B. Lowenstein & Bros, Inc., 175 Tenn. 535, 539, 136 S. W. (2d) 495, 496. See also: Southeastern Greyhound Lines, Inc. v. Groves, 175 Tenn. 584, 136 S. W. (2d) 512, 127 A. L. R. 1378.

''If the actor's conduct is a substantial factor in bringing about harm to another, the fact that the actor neither foresaw nor should have foreseen the extent of the harm or the manner in which it occurred does not prevent him from being liable.'' Restatement of Torts, Sec. 435.

■ So the particular harm which actually befell Spivey need not have been foreseeable. It is enough that some such harm of a like general character was reasonably

foreseeable as a likely result of defendant's failure to use due care to keep him in bed and to protect him against getting out of the window in his delirium.

But quite apart from this view of the case, we think the jury could well have found that his act was not so unusual or extraordinary as to be beyond the range of reasonable expectation; but that it was a thing which might reasonably have been expected to occur in view of his condition. Common experience shows that patients in such condition often jump or fall out of upper-story windows of hospitals. Such cases are numerous in the reported decisions.

A leading case is that of Wetzel v. Omaho Maternity and General Hospital Association, 96 Neb. 636, 148 N. W. 582, 583, Ann. Cas. 1915B, 1224. There a patient was delirious with typhoid fever. In the absence of the nurse, and under circumstances quite similar to those in the case before us, he jumped out a third-story window, struck the pavement, and his death resulted. The court said under the circumstances his act "may well have been foreseen."

Other cases more or less similar are: Robertson v. Charles B. Towns Hospital, 178 App. Div. 285, 165 N. Y. S. 17; Emory University v. Shadburn, 47 Ga. App. 643, 171 S. E. 192; Mulliner v. Evangelischer Diakonniessenverein, 144 Minn. 392, 175 N. W. 699; Tate v. McCall Hospital, 57 Ga. App. 824, 196 S. E. 906; Wood v. Samaritan Institution, 26 Cal. (2d), 847, 161 P. (2d) 556; Valentin v. La Societe Francaise de Bienfaisance, Etc., 76 Cal. App. (2d) 1, 172 P. (2d) 359; Tulsa Hospital Ass'n v. Juby, 73 Okl. 243, 175 P. 519, 22 A. L. R. 333; Sisters of the Sorrowful Mother v. Zeidler, 183 Okl. 454, 82 P. (2d) 996; Maki v. Murray Hospital,

91 Mont. 251, 7 P. (2d) 228. See also cases in the Annotations, 22 A. L. R. 347, 124 A. L. R. 195.

Learned counsel for defendant rely on James v. Turner, 184 Tenn. 563, 201 S. W. (2d) 691. That case cites the Wetzel case, supra, with approval. But its facts differentiated it from that case and from the case before us. There the patient was not delirious, but was suffering from nervousness and a homicidal tendency. He, however, had been in the hospital ten days and had shown improvement. His wife had taken him to town twice and he had gone once by himself. The Court found that nothing in his conduct gave notice that he might climb 53 feet up a tower to a water tank and drown himself in it, and that defendants were not negligent.

The case of O'Quin v. Baptist Memorial Hospital, 184 Tenn. 570, 201 S. W. (2d) 694, likewise differed in its facts from this case. There the patient became unruly and his father and brother started with him out of the hospital. He created a disturbance and city policemen were called. One of them shot and killed him in self-defense. The Court found the policeman was not the servant of the hospital, and it was in no wise negligent.

For defendant it is objected that there was no evidence to show Spivy might not have died of pneumonia, even if he had had no accident. There is no merit in such an objection. There was ample evidence to support the jury's finding that Spivey's death was caused by the injuries he sustained in the accident. The fact that he was ill, even if it could be said he might later have died of such illness, did not prevent defendant's negligence from being the legal or proximate cause of his death. McCahill v. N. Y. Transportation Co., 201 N. Y. 221, 94 N. E. 616, 617, 48 L. R. A., N. S., 131 Ann.

Cas. 1912A, 961; Jeremiah Smith, Legal Cause in Actions of Tort, Selected Essays on the Law of Torts, 715, and cases there cited.

So we think the trial judge rightly submitted the case to the jury, and there is ample evidence to support the verdict.

 Defendant complains of the amount of the verdict. Among other things it is urged that, without the accident, Spivey might later have died of pneumonia. The jury might well have considered that it was more probable that he would recover. He was 26 years of age and had previously enjoyed good health. The jury were properly instructed to consider his condition of health and all other relevant factors. It was for the jury to balance all the probabilities in forming an estimate of the damages. This is much the same thing the jury has to do in any action for damages for wrongful death. The uncertainties inherent in such a process are no objection to allowing such damages as seem a fair equivalent of the economic loss which resulted to plaintiff and her child from the death sued for. Provident L. & A. Ins. Co. v. Globe Ind. Co., 156 Tenn. 571, 576, 3 S. W. (2d) 1057; Tallent v. Fox, 24 Tenn. App. 96, 118, 119, 141 S. W. (2d) 485. We cannot say that the amount allowed was too much.

 Defendant assigns two errors upon the charge. We find both of them to be without merit. It also assigns a number of errors upon the trial court's refusal to charge several special instructions requested by it. Without setting them out, we think they were properly denied. Such of them as were correct had already been adequately covered in the general charge.

█ Defendant finds fault with the form of the judgment in that it did not specifically provide that it could be satisfied only out of defendant's non-trust property. It could later raise such a question if its exempt property should be seized. Anderson v. Armstrong, 180 Tenn. 56, 171 S. W. (2d) 401. But the judgment will here be modified so as to state that execution can be levied only upon such property of defendant as is not directly and exclusively used for the purposes of the trust.

All of the assignments of error are overruled. The judgment of the circuit court will be modified as above indicated and as modified will be affirmed. The costs are adjudged against defendant and the surety on its appeal bond.

Howell and Hickerson, JJ., concur.