METHODIST HOSPITAL, Plaintiff-in-Error, v. CHARLES P. BALL, Administrator of the Estate of Charles P. Ball, Jr., Defendant-in-Error.—362 S. W. (2d, 475.

Western Section at Jackson. July 28, 1961.

Certiorari Denied by Supreme Court December 8, 1961.

462

Armstead Clay, Millsaps Fitzhugh, Memphis, for plaintiff in error.

Lucius Burch, Jr., Tom Mitchell, Jr., Ray Churchill, Memphis, for defendant in error.

CARNEY, J. The plaintiff below, Charles P. Ball, Administrator, recovered a judgment of $25,000 for the alleged wrongful death of his son, Charles P. Ball, Jr. The hospital has appealed in error.

The son, aged 16, was injured about 11:20 P.M. on the night of October 31, 1958, while riding as a passenger in an automobile driven by his mother, Mrs. Charles P. Ball. Also in the automobile were a young lady, Miss Joy Blakely and a young man, Jordan Moore, both teen-age friends of young Ball.

The young people had attended a Halloween party at the Graceland Baptist Church in Whitehaven, a suburb

of Memphis, Tennessee. After the party they went to the home of Mr. and Mrs. Ball. Charles Ball, Jr., did not have a driver's license. He requested his mother to drive his friends home. She agreed. Jordan Moore was sitting on the right front seat beside Mrs. Ball; Charles on the right rear seat and Joy Blakely on the left rear seat. About five minutes after they left home the automobile driven by Mrs. Ball was struck a severe blow at or about the right rear door by another automobile.

Mrs. Ball and the three teen-agers were taken to the emergency room of the defendant, Methodist Hospital, in Memphis, Tennessee. Mrs. Ball and Miss Blakely received cuts and bruises but were less seriously injured than were Jordan Moore and Charles P. Ball, Jr. Young Moore and Miss Blakely were carried to the hospital in one ambulance and Mrs. Ball and her son in another. Moore and Ball were on stretchers. Miss Blakely and Mrs. Ball were ambulatory.

Young Moore and young Ball were left on stretchers in the main portion of the emergency room. There were three cubicles adjoining the main emergency room which can be closed by curtains for the examination of patients. Joy Blakely was placed on a table in the first cubicle. There was a private patient being treated by a Dr. McLarty in the second cubicle and Mrs. Ball, the mother of the deceased, was placed on a table in the third cubicle, the one farthest from the main emergency room where young Ball was left on a stretcher just inside the doorway from the parking lot.

The Methodist Hospital was crowded and only one bed was available. The intern and the nurses in charge of the emergency room determined that young Moore who

had brain injuries was the most seriously injured of the four and he was given the one available bed in the hospital. He died the following day.

Young Ball was carried into the emergency room of the Methodist Hospital about 11:45 P.M. and remained on a stretcher in the emergency room near the door until about 12:30 A.M. when the intern in charge of the emergency room gave instructions to the ambulance driver to take young Ball to the emergency room of the John Gaston Hospital. John Gaston Hospital is operated primarily as a charity hospital by the City of Memphis.

The records of the John Gaston Hospital show that Charles Ball, Jr., was received in the emergency room at 12:45 A.M. on November 1 and died about fifteen minutes later.

The plaintiff's declaration alleged that Charles P. Ball, Jr., died as a concurrent result of injuries he sustained in the automobile accident on October 31, 1958, and the failure of the defendant hospital to exercise such reasonable and ordinary care toward the son as his condition required after it received him as a patient.

The declaration further averred that following the automobile accident plaintiff's son was delivered on a stretcher to the emergency room of the defendant hospital by ambulance; that defendant's employees knew, or in the exercise of reasonable and ordinary care could or should have known, that he had sustained serious injuries including a lacerated liver which was causing blood to enter into the abdominal cavity and that he was in a state of shock; that the defendant, through its agents or employees, failed to take his pulse properly; failed to examine him properly; failed to administer any proper

treatment; that it was negligent in these failures; that it falsely accused him of being drunk; that it forcibly and negligently caused him to be strapped to a stretcher, evicted from its emergency room and transported to the John Gaston Hospital where he died a short while after arrival; that it negligently ejected him from its hospital under circumstances evincing a complete and utter disregard of the duties owed by it to him, thereby causing and/or hastening and/or contributing to bringing about his death; that its acts and conduct were gross and wanton.

In addition to a plea of general issue the defendant also filed special pleas in which it denied that anything it did or failed to do contributed to the death of the deceased; denied that it failed to exercise such reasonable and ordinary care toward him as his condition required; and denied that it received young Ball as a patient; while admitting that the young man came to its emergency room by ambulance it denied that the intern on duty knew or in the exercise of reasonable or ordinary care could or should have known that the plaintiff's son had suffered a lacerated liver which was causing blood to enter the abdominal cavity; and it denied that the son was in a state of shock while in its hospital.

Further the defendant pleaded that while the intern on duty, Dr. Walter H. Murphy, was busy working with young Moore who seemed to be more seriously injured, young Ball tried to get off the stretcher; that his pulse and blood pressure were taken and were found to be within normal range and when young Ball persisted in his efforts to get up Dr. Murphy let him be restrained to keep him from falling from the stretcher or otherwise hurting himself.

Further the defendant averred that the decision by Dr. Murphy to admit young Moore to the hospital and to transfer young Ball to another hospital was in the exercise of medical judgment and was not negligence; that Dr. Murphy thought the plaintiff's son was in fair condition and it would be safe enough for him to be transferred. The defendant further averred that the act of physically restraining plaintiff's son was done pursuant to the exercise of medical judgment and was for the protection of plaintiff's son and was not negligently done.

The defendant specifically denied that it failed to take the pulse of plaintiff's son properly; denied that it failed to examine plaintiff's son; denied that plaintiff's son was ever admitted to its hospital as a patient; denied that it negligently failed to administer any proper treatment to plaintiff's son; denied that it violated any duty owed by it to plaintiff's son; denied that it caused or hastened or contributed to the death of plaintiff's son; denied that it aggravated the pain, suffering, or mental agony or anguish of plaintiff's son; denied that the acts or conduct of its agents, servants, or employees were gross or wanton; denied that it was guilty of any of the acts of negligence alleged in plaintiff's declaration, but averred that if it committed any such act complained of, such act was pursuant to the exercise of medical judgment and was not negligence; and it denied all allegations of the plaintiff's declaration not theretofore admitted or denied.

There was a lengthy and hard-fought trial before the jury. At the conclusion of plaintiff's proof the defendant's motion for a directed verdict was overruled.

The defendant thereupon introduced in evidence the testimony of the following witnesses:

(1) Dr. Walter H. Murphy, the intern who was in charge of the emergency room at Methodist Hospital on the night in question;

(2) Dr. Tinnin Martin, Jr., a private physician who happened to be in the emergency room at Methodist Hospital a portion of the time that young Ball was lying on a stretcher there. Dr. Martin at no time administered unto young Ball but did give some attention to young Moore;

(3) Mrs. Katherine Pennington, a registered nurse, the night supervisor at Methodist Hospital. Mrs. Pennington was in and out of the emergency room one or more times while young Ball was there;

(4) Dr. Barney E. McLarty, a general practitioner who was in the emergency room sewing up a cut wrist on a young boy, his private patient, when young Ball and young Moore, Miss Blakely and Mrs. Ball were brought into the emergency room;

(5) Miss Barbara Ann Smith, registered nurse who was on duty in the emergency room of Methodist Hospital on the night of the Ball accident;

(6) Mrs. Paul A. Gowan, Jr., a registered nurse who was assistant night supervisor at the Methodist Hospital on the night of October 31, 1958, who was in the emergency room assisting Dr. B. E. McLarty suture the wrist wound of the little boy at the time the four occupants of the Ball automobile were brought in;

(7) Dr. Charles L. Clarke, private practitioner of Memphis who was not present on the night in question but testified as an expert witness for the defendant;

(8) Dr. Russell Paterson, general surgeon who does most of his surgery at the Baptist Hospital in Memphis and who testified as an expert witness for the defendant;

(9) Dr. Giles Coors, general surgeon also testified as an expert witness for the defense.

The defendant's assignment of error No. 1 insists that there was no material evidence to support a verdict in favor of the plaintiff and that His Honor the Trial Judge should have directed a verdict in favor of the defendant.

■ An intern selected and paid by the hospital is not an independent contractor but is an employee of the hospital for whose negligence the hospital is liable even though there was no negligence by the hospital in the selection and employment of the intern. Sepaugh v. Methodist Hospital (1947), 30 Tenn. App. 25, 202 S. W. (2d) 985.

■ It is admitted in the present case that Dr. W. H. Murphy, an intern employed by the Methodist Hospital, was on duty and in charge of the emergency room of the hospital on the night in question. We find no merit in the insistance by the plaintiff-in-error hospital that it is not liable for the alleged negligent examination and treatment of the deceased by its intern and nurses in the emergency room. Young Ball was a patient even though he was never given a room in the hospital and stayed in the emergency room only forty-five minutes approximately.

Next we examine the record to see whether or not there was material evidence to support the jury's finding that defendant's employee, Dr. Murphy, was negligent and

that such negligence caused or hastened the death of the deceased.

There was a very sharp conflict between the testimony of plaintiff's witnesses and defendant's witnesses as to the manner in which young Ball was treated while in the emergency room of the defendant hospital. There is also very sharp conflict between the testimony of the plaintiff's expert witness, Dr. James R. Teabeaut, and defendant's expert witnesses as to the proper methods of examination and diagnosis which Dr. Murphy, the intern in charge, should have applied in his examination and diagnosis of young Ball's condition.

██ As was so well said by Judge Felts in Spivey v. St. Thomas Hospital (1947), 31 Tenn. App. 12, 211 S. W. (2d) 450, "Learned counsel sharply differ in their views of the evidence. It is not for us, however, to settle such differences. That was for the jury. They rendered a general vedict for plaintiff, and we must take it as settling most of such differences in her favor. We have to decide only whether the circumstances of the case for plaintiff were sufficient, in point of law and reason, to permit the jury to find a verdict for her. Whirley v. Whiteman, 38 Tenn. 610, 616; Thayer on Evidence, 208-227, 234-250; Tyrus v. Railroad, 114 Tenn. 579, 594, 86 S. W. 1074, 1077; Brenizer v. N. C. & St. L. Ry., 156 Tenn. 479, 3 S. W. (2d) 1053, 8 S. W. (2d) 1099; Osborn v. City of Nashville, 182 Tenn. 197, 201, 204, 185 S. W. (2d) 510, 512.

"And in so deciding, we must look to all the evidence, construe it most favorably to plaintiff, take as true that which tends to support her right, discard all countervailing evidence, and from the rest of it allow all reasonable inferences to uphold the verdict. Wildman Mfg. Co. v.

Davenport Hosiery Mills, 147 Tenn. 551, 249 S. W. 984; Osborn v. City of Nashville, supra; Poole v. First Nat. Bank of Smyrna, [29] Tenn. App. [327], 196 S. W. (2d) 563; Sepaugh v. Methodist Hospital, [30] Tenn. App. [25], 202 S. W. (2d) 985, 989.''

Mr. Charles P. Ball, Sr., testified that he was at home when he received news of the accident in which his wife and son had been involved; that he went to the scene of the accident which was about two and one-half miles from his home and his wife and son were still there ready to leave in the ambulance for the hospital. Mr. Ball requested a highway patrolman to drive him to the hospital and the patrolman, for some unexplained reason, took a circuitous route. When Mr. Ball reached the Methodist Hospital his son had already been removed and sent on his way to John Gaston Hospital. Mr. Ball, in company with Mr. Baker who was a witness for plaintiffs, proceeded to John Gaston Hospital and learned that his son had died shortly before he arrived. Mr. Ball then returned immediately to the Methodist Hospital and made arrangements to and did transfer his wife, Mrs. Ball, to the Baptist Hospital in Memphis.

Mrs. Ball rode to the hospital in the ambulance with her son. She testified that he made no sound on the way to the hospital and she did not believe he was conscious. He was lying on his back. Upon entering the emergency room Mrs. Ball was shown to the third of three cubicles which were to the left of the door through which she entered and placed on an examination table. Charles was left on his stretcher just inside the emergency room door. Mrs. Ball was in the cubicle the farthest away from the door. She testified that she was at no time examined for injuries by anyone while she was there but she was only

asked by a nurse concerning her identity. She told the nurse that she was the mother of Charles.

Mrs. Ball testified that at no time was her blood pressure or pulse taken or any examination of any kind made of her while she was at the Methodist Hospital. While she could not see her son, Charles, she testified that she did hear him scream out, ''Please don't, stop, you're killing me.'' Mrs. Ball testified that she was not given any information about her son's condition by the hospital personnel. Her friend Mrs. Dozier, mother of Joy Blakely, told her that Charles was sent to John Gaston. She learned of her son's death after her husband returned from John Gaston Hospital.

Plaintiff's witness, Mr. Wayne E. Baker, Sr., a cabinet maker who lived in Whitehaven, had not been acquainted with any of the Ball family prior to the night of the accident. Mr. Baker testified that he was a member of the volunteer fire department of the community of Whitehaven and that the fire department followed a regular course of attending wrecks in the vicinity primarily to render first aid to the injured and to render assistance to members of the family. On the night in question Mr. Baker said he arrived at the scene of the accident at or about the time two ambulances were leaving with the injured people.

It developed that the young lady, Miss Joy Blakely, was a friend of Mr. Baker's daughter though he did not know her parents, Mr. and Mrs. W. R. Dozier. Mr. Baker drove Mr. and Mrs. Dozier to the Methodist Hospital.

He estimated that he arrived at the hospital some twenty minutes behind the ambulances. When he arrived young Ball was lying on a stretcher near what he called

the back door to the emergency room seemingly unconscious. Mr. Baker testified that he remained at the hospital until the Ball boy was taken from the emergency room, put back in the ambulance and carried to John Gaston Hospital.

Mr. Baker testified that he was in sight of the Ball boy nearly all of the time he was at the hospital and he never saw anybody minister to the Ball boy in any manner, neither taking his pulse nor his blood pressure nor examining him in any manner. Mr. Baker said after he had been there about ten minutes the Ball boy roused, sat up on the stretcher, grabbed himself across the stomach and said, "I'm hurting, won't somebody please do something for me." A uniformed policeman who had been present in the emergency room all the time reached and grabbed him by the shoulder, pushed him back on the stretcher and said, "There is nothing wrong with you but you are drunk." Mr. Baker said the policeman turned to the two ambulance attendants and told them, "Take him to John Gaston Hospital. We don't fool with drunks here." The boy attempted to get up again from the stretcher and a scuffle ensued.

The uniformed policeman was identified as a Mr. Ogelvie who was regularly employed as a night watchman at the Methodist Hospital. Mr. Crews, the administrator of the hospital testified that Mr. Ogelvie, who was dead at the time of the trial, did everything that a night watchman was supposed to do at the hospital and when helping in the emergency room was subject to the supervision of the intern and nurses in charge.

Mr. Baker's account of the manner in which the Ball boy was restrained is as follows:

"Q Did other people come to help Mr. Ogelvie with the boy?

"A Yes, sir.

"Q Who were they?

"A Two ambulance drivers, and two people who I presume were interns.

"Q What makes you presume they were interns?

"A They were dressed in green, green hospital uniforms.

"Q And who else?

"A There was two nurses.

"Q And what did they do?

"A A scuffle ensued, and the boy wound up on the stretcher on his stomach with one ambulance attendant with his knees on his back approximately between the lower ribs, the lower section here (indicating), and his hips, both knees on each side. The other ambulance driver was backed up to him sitting across him approximately here (indicating), trying to hold his feet. The interns and the nurses were assisting in this holding his hands, his body, his head, his feet. The uniformed patrolman—

"Q Refer to him as Mr. Ogelvie.

"A Mr. Ogelvie went to the ambulance and secured a web belt approximately three to three and a half inches wide, and they literally tied that boy to that stretcher, tied him to where he couldn't move, took him to the ambulance.

"Mr. Ogelvie opened the ambulance doors. The two ambulance attendants took hold of the stretcher and pitched it into the ambulance. It being on wheels, rolled and hit the back of the seat and bounced back. In tying the boy on the stretcher, they hadn't tied from the knees down. When it bounced back his knees folded up, him being on his stomach, his knees folded up into the air. Mr. Ogelvie reached and grabbed his feet and shoved it back, pulled his feet back and shoved it back in, and his feet immediately came up again, but before he could get back to hit the door, Mr. Ogelvie slammed the two doors of the ambulance to.

"Q. And he was sent off with his feet—

"A Straight up.

"Q Did you go on over to John Gaston Hospital after that?

"A Yes, sir, Mr. Ball and I went."

In his testimony Dr. Murphy admitted that he gave the order to restrain young Ball as he was trying to get up from the stretcher but did not supervise the restraint, that being left up to Mr. Ogelvie, the night watchman. Dr. Murphy denied that young Ball was charged with being drunk by anyone, though he, Dr. Murphy, testified that he smelled the odor of alcohol about Ball's stretcher. An original record at the hospital under the heading "Diagnosis and Treatment" recites "very unruly, appears intoxicated ? internal injuries." The notation "? internal injuries" appears to be in different handwriting from the other notation.

Dr. Tinnin Martin, Jr., witness for defense, who happened to be in the emergency room on the night in ques-

tion testified that while he never examined young Ball he saw him on the stretcher and thought that he was drunk. He saw the policeman and others restraining young Ball but could not remember the details.

Katherine Pennington, R.N., night supervisor at Methodist Hospital along with Mrs. Paul A. Gowan, Jr., R.N., who was also in the emergency room on the night in question, both gave statements to Mr. Crews, the administrator of the hospital shortly after young Ball died, "We both heard drinking mentioned, but neither of us smelled any alcohol if there was any." In their testimony before the jury they could not remember whom they heard mention drinking.

Mr. Baker, Mr. Dozier, the father of Joy Blakely, and Dr. W. David Dunavant, personal physician for Mr. and Mrs. Ball, all protested to Mr. Crews, administrator of the defendant hospital, over the alleged mistreatment of young Ball. After investigation by Mr. Crews he reported to each of these gentlemen by letter. All three letters were substantially the same and we copy the letter to Mr. Baker as follows:

"November 10th, 1958

"Mr. Wayne Baker
610 East Raines Road
Whitehaven, Tennessee

"Dear Mr. Baker:

"After our telephone conversation the other night concerning a patient, Charles Ball, I investigated the incident and the following paragraphs contain the written reports from the intern and nurses on duty in the Emergency Room.

"Our intern, Dr. W. H. Murphy was on duty in the Emergency Room at the time the victims of the wreck in which Charles Ball was injured were brought in; also, Mrs. Gowan and Mrs. Katherine Pennington, night supervisors. There were several other patients in the Emergency Room at the time the four victims were brought in. In addition to our Staff, Dr. McLarty was in an adjacent room seeing a patient of his, and Dr. Dan Mills was also present.

"On examination, Dr. Murphy found that Charles Ball had a blood pressure of 120/80 and that even though his abdomen appeared tender, Jordan Moore, one of the other victims, was in worse condition. As you probably know, Jordan Moore was admitted to the Methodist Hospital and when Charles Ball became violent, it was necessary that the two Medic ambulance attendants, our night watchman, Dr. Tinnin Martin and Mrs. Gowan hold the the boy on the stretcher to prevent any further injury. He was trying to get up and walk around and this could not have been allowed. Dr. Murphy said it might have appeared that he was handled in a rough manner by an untrained observer, but it was necessary to put him in restraints for his own good.

"It was most unfortunate that we did not have facilities at Methodist Hospital to take care of all eight people that were in the Emergency Room at this time and that it was necessary to transfer somebody, which was Charles Ball, to another hospital. We regret very much that the family feels that their son was not treated properly in the Emergency Room at Methodist Hospital. However, I have a written report from all of the Methodist Hospital Staff who

were present and have talked to the other doctors who were in the Emergency Room, but not involved in treating these patients, and they do not feel that the criticism is justified. Dr. Murphy said he did notice the odor of alcohol in the Emergency Room, but did not say, or hear anyone say, that Charles Ball had been drinking and that 'we do not take care of drunks at Methodist Hospital.' The odor of alcohol could have been from some of the other patients in the Emergency Room at that same time. The remark could have also been made by someone else in the room because there were others present that were either visitors or friends of the patients. With the large number of emergency cases in the room, plus a number of visitors, the confusion was great, I am sure.

"It is our intention at Methodist Hospital to give the best service we can to the public and we have nothing to conceal from the doctor nor the patient. I believe that the patients were handled in the best judgment of our Dr. Murphy. If you would like to, I would be glad for you to talk to these individuals at any time and they will give you an honest evaluation of the situation.

"I appreciate very much your interest in the case and will furnish any information that you might suggest. Please do not hesitate to let me me hear from you further if the information contained in this letter is not to your entire satisfaction.

"Sincerely yours,

J. M. Crews

Administrator

JMC:cr"

Mr. Baker said the only alcohol which he smelled in the emergency room was rubbing alcohol but he smelled no liquor.

Mr. and Mrs. Dozier parents of Joy Blakely, corroborate the testimony of Mr. Baker as to the rough handling of young Ball by the policeman and others on the night in question. Mrs. Dozier testified that the curtain to the cubicle in which her daughter, Joy Blakely, was placed was open and she had a clear view of young Ball as he lay on the stretcher; that during the entire time she was there at the Methodist Hospital she never saw anyone, nurse or intern, minister to Charles Ball in any manner. Young Ball had on a V-neck, long-sleeved, heavy gray pullover sweater which was never removed for any sort of examination.

Both Mr. and Mrs. Dozier, out of the presence of the jury, corroborated the testimony of Mr. Baker to the effect that Mr. Ogelvie accused young Ball of being drunk but this testimony was excluded from the jury by His Honor the Trial Judge on the ground that it was hearsay and incompetent.

Plaintiff's medical expert was Dr. James Robert Teabeaut, II. His qualifications as an expert in this case are assailed by defendant's assignment of error No. VI.

Dr. Teabeaut was graduated from Duke University School of Medicine in 1947 and served a year's internship in the Duke University Hospital during 1947 and 1948. He took an additional year's training as intern in internal medicine at Duke University Hospital during 1948 and 1949. During 1949 through 1951 Dr. Teabeaut was a Rockefeller Research Fellow at Harvard University. From 1951 until 1954 he served as Chief of the

section on legal medicine for the Armed Forces Institute in Washington, D. C.

From 1954 through 1959 Dr. Teabeaut was assistant professor of Pathology at the University of Tennessee Medical School in Memphis. From 1956 through 1959 he served as coroner for Shelby County, Tennessee. He is licensed to practice medicine in Tennessee and Georgia. At the time of the trial he was engaged as assistant professor of Pathology at the Medical College of Georgia. Dr. Teabeaut testified that since 1949 he had been engaged in the private practice of medicine on a referral or consultant basis and had treated many patients referred to him by other physicians.

Dr. Teabeaut defined pathology as embracing the whole field of medicine and dealing particularly and specifically with the determination of the cause of death by autopsy. He characterizes himself as being a specialist in the field of Forensic Pathology which he defines as that aspect of pathology that is argued and discussed in court. Also he described himself as one of the organizers or sponsors of the American Board of Forensic Pathology which was created in 1959.

Dr. Teabeaut testified that he worked in the emergency room of the Duke University Hospital during his two years as intern and that he had had experience treating patients with ruptured livers in hospitals as well as performing autopsies on bodies of people who had sustained ruptured livers. He testified that he had participated in the performance of over 4,000 autopsies. Dr. Teabeaut was present at the time an autopsy was performed on the body of Charles Ball, Jr., though he did not perform the autopsy.

On the basis of these qualifications we think His Honor the Trial Judge was correct in permitting Dr. Teabeaut to testify as an expert as to the cause or causes of death of young Ball and also as to the examination and treatment which Dr. Teabeaut says could have been and should have been administered to young Ball when he was brought into the emergency room of Methodist Hospital. Assignment of error VI is therefore respectfully overruled. Quinley v. Cocke et al., 183 Tenn. 428, 192 S. W. (2d) 992; Benson v. Fowler, 43 Tenn. App. 147, 306 S. W. (2d) 49.

The testimony of Dr. Teabeaut consumes over 100 pages of the voluminous record of almost 1,000 pages. It would prolong unduly this opinion to outline his entire testimony.

We summarize what we consider to be the salient and most important portions thereof as follows: Dr. Teabeaut testified that the autopsy on young Ball showed that there was absolutely no evidence of alcohol within his body; that Young Ball had sustained a ruptured liver as a result of the automobile accident causing internal bleeding and that the autopsy revealed the presence of over 3,000 c.c. of blood in the abdominal cavity. Some of the witnesses testified that this was approximately three-fifths of the entire blood supply of the body.

Dr. Teabeaut testified that the autopsy revealed that the liver of young Ball was both lacerated and macerated. He explained the difference between laceration and maceration by likening the liver to a ripe tomato. He explained that when a ripe tomato is dropped a short distance onto a hard surface splitting open with even lines of cleavage in the skin such breaks in the tomato would be similar to the laceration found on young Ball's liver.

On the other hand if the split tomato should be picked up and the lacerated pieces rubbed together so as to damage the pulp or edges that would be likened to the maceration of young Ball's liver.

Dr. Teabeaut explained that the liver is located in the upper right abdominal cavity and that Charles Ball received the lacerated liver in the automobile collision as a result of his right side being thrown against the arm rest on the right rear seat; that such injuries frequently occur in automobile collisons. He further gave as an expert opinion that the maceration of the liver was caused by additional pressure being placed upon the boy's back after he had already sustained the lacerated liver.

He also gave an opinion as an expert that the rough treatment which young Ball allegedly received in the emergency room of the hospital including the placing of someone's knees in his back caused the maceration found on his liver, increased the internal bleeding and destroyed whatever clotting of the blood which might have been started at the site of the laceration. Dr. Teabeaut further testified that among all the autopsies which he had performed he had never seen a liver macerated as a result of an automobile accident.

Further he testified in answer to hypothetical questions that in his opinion young Ball did not receive the proper care and attention when he was in the emergency room of the Methodist Hospital. In his opinion in the exercise of that degree of skill and training which was commonly exercised in emergency rooms of hospitals in and around Memphis, Tennessee, on or about October 31, 1958, when young Ball was admitted to the emergency room as an automobile accident victim the intern in charge should have done the following things: (1) Take

a history of the manner in which the accident occurred and the place where the injured person was sitting in the automobile at the time of the impact. Dr. Teabeaut explained that victims sitting on the right front seat oftentimes have head injuries as a result of being thrown forward into the windshield. This opinion is supported in the present case because young Moore was sitting on the right front and sustained head injuries which were fatal. The driver in an automobile accident oftentimes sustains chest injuries as a result of being crushed against the steering wheel. The person sitting on the right rear seat oftentimes sustains a ruptured liver and consequent internal bleeding as a result of being thrown against the arm rest.

Dr. Murphy admitted that he asked no questions concerning the manner in which the accident occurred or where any of the parties were sitting.

(2) Examine the occupant of the right rear seat for internal injuries particularly for injuries to the liver, spleen or intestinal tract. Internal bleeding could be diagnosed by checking frequently the victim's blood pressure and pulse rate.

Dr. Murphy insists that he did check the blood pressure and pulse of young Ball on two occasions and that they appeared to be normal at all times. He is contradicted by plaintiff's lay witnesses and also the expert testimony of Dr. Teabeaut. Plaintiff insists that with young Ball losing so much blood internally a frequent blood pressure check and pulse rate check would have revealed the internal injuries and bleeding to the intern.

(3) Palpate the muscles of the patient's abdomen for rigidity occurring as a natural splinting process to over-

come the pain caused by blood flowing into the abdominal cavity. Dr. Teabeaut explained that the natural tendency of a patient suffering from a ruptured liver and internal bleeding is to curl up or bend over in some manner in an attempt to reduce the pain caused by the blood flowing into the abdomen.

Dr. Murphy, the intern, testified that he felt the abdomen of the deceased, noticed more pain in the abdomen than elsewhere but he did not diagnose his injuries as a ruptured liver. It is the plaintiff's theory that when young Ball attempted to get off the stretcher and asked someone to do something for him that he was suffering pain as a result of the increased amount of blood in his abdomen and he was changing his position in an effort to reduce the pain.

(4) The intern should have diagnosed the ruptured liver and the internal bleeding after a very short but intensive examination and should have instituted immediately supportive measures to maintain the patient's blood pressure to wit, giving the patient intravenously glucose, saline solution, plasma or universal type O blood. Following these supportive measures all of which could have been done in the emergency room the patient should have been taken to surgery to stop the internal bleeding.

The record shows that Dr. Murphy as an intern would not have been permitted to perform the surgery on the victim but that there was a resident physician on duty at the hospital as well as other members of the staff who were subject to immediate call. The resident physician was never called by Dr. Murphy for any purpose on the night in question.

Finally Dr. Teabeaut stated in substance in his opinion if the proper diagnosis of young Ball's injuries had been

made as early as might have been done under the degree of care and skill then prevailing in Memphis and if the supportive and remedial proceedings outlined above had been instituted, young Ball's life might and probably would have been saved. Further he testified that in his opinion the traumatic episode which subsequently occurred in the application of restraint and application of force to young Ball's body could have aggravated and probably did aggravate the already existing injury to the extent that young Ball's death was hastened.

Dr. Murphy testified that he did examine young Ball when he was admitted to the emergency room; that he undid a part of his clothes and felt of his abdomen and found more pain there than anywhere else; that on one occasion he took the patient's blood pressure and found it normal and on another occasion he accepted a blood pressure reading from one of the nurses which he determined to be normal. On two occasions he felt the pulse of the deceased and each time found it normal; that while he felt that young Ball might have some internal injuries yet he felt that he was able to be moved to another hospital for examination and treatment since they had no room for him to be admitted in the Methodist Hospital. He denied expressly that he ever charged young Ball with being drunk and denied that he heard anyone else charge him with being drunk and expressly denied that young Ball was treated as a drunk instead of an injured person. Both he and the nurses admitted that on many occasions they did transfer drunk accident victims to the John Gaston Hospital.

The expert witnesses submitted by defendant on the basis of hypothetical questions testified that the examination of young Ball by Dr. Murphy and the conditions and

symptoms then appearing to him did not indicate a lacerated liver and internal bleeding nor did they indicate that young Ball was in a state of shock. These hypothetical questions were based on the assumption that the blood pressure reading and the pulse beat of young Ball were normal; that young Ball gave no outward appearance of having been in an accident and that he was not pale or sweaty and other circumstances related by Dr. Murphy.

However, one of the expert witnesses for the defense, Dr. Clarke, corroborated Dr. Teabeaut to the effect that if any appreciable internal bleeding has occurred, then the patient will most certainly be in shock and that if an intern should determine that such injured person was in shock then he should treat the patient for shock in the emergency room such as by the use of blood or plasma transfusions, covering the patient with blankets to keep him warm and the use of certain drugs to bolster the blood pressure.

Further on cross-examination in answer to a hypothetical question submitted by counsel for plaintiff containing assumed facts substantially in accordance with plaintiff's theory of the case Dr. Clarke testified that the patient had not received the degree of care and skill that obtains in emergency rooms generally in the community. However, Dr. Clarke made it clear that he did not believe the facts set out in the hypothetical question accurately represented the true facts in the case.

The solicitors for plaintiff-in-error insist very strenuously that it is a physician's privilege to decide between one of two or more courses in the treatment of patients and a physician cannot be held responsible for an erroneous exercise of judgment, citing McPeak v. Vanderbilt Hospital, 33 Tenn. App. 76, 299 S. W. (2d)

150; Blankenship v. Baptist Hospital, 26 Tenn. App. 131, 168 S. W. (2d) 491; Floyd v. Walls, 26 Tenn. App. 151, 168 S. W. (2d) 602. This statement of the law is correct but it must be predicated upon the assumption that the physician has used ordinary care and skill in making the examination of the patient and in arriving at a diagnosis of his condition.

An excellent statement of the rule is found in Bourgeois v. Dade County (1957), Fla., 99 So. (2d) 575, 72 A.L.R. (2d) 391, page 394:

"Admittedly the science of medicine is not an exact science. Physicians are not to be held liable for honest errors of judgment. They are allowed a wide range in the exercise of their judgment and discretion. To hold one liable it must be shown that the course which he pursued was clearly against the course recognized as correct by his profession. On the other hand the attending physician must use the judgment and form the opinions of one possessed of knowledge and skill common to medical men practicing in the same or similar communities. Regan, Doctor and Patient and the Law, Sec. 39, p. 227.

"The responsibility and degree of care imposed upon the appellee hospital is to be measured by the responsibility and degree of care imposed upon its employees, the intern and nurses in the emergency ward."

In the Bourgeois case the intern at the defendant hospital had examined a patient, decided that he was drunk and turned him over to the police as a drunk after about fifteen or twenty minutes. The patient was confined in jail overnight and found dead the next morning. An

autopsy revealed that the ultimate cause of death was the puncture of the chest by several of some nine ribs which had been fractured at the spinal column. The court reversed a directed verdict for the defendant and held that there was sufficient evidence to go to the jury on the question of negligence by the intern in the treatment, examination and ultimate diagnosis of the decedent's condition.

Dr. Murphy did testify that he diagnosed young Ball's condition as being critical and having possible internal injuries and ordered him sent to John Gaston Hospital where he could be admitted and treated. The hospital records show a notation that Ball's condition was "critical." However, there is evidence that these records were written up or added to by Dr. Murphy and/or some of the nurses after news had come to the emergency room at Methodist Hospital that young Ball had died shortly after leaving the Methodist Hospital. The word "critical" is the most extreme word used by doctors and hospital employees to describe a patient's condition. Dr. Murphy testified that it means that a patient's condition is likely to change at any time. The witnesses all seemed to agree that time is of the essence in the treatment of internal bleeding.

So then upon either prong of plaintiff's theory of the case we hold there was substantial material evidence upon which the jury might reasonably find Dr. Murphy guilty of negligence: (1) That Dr. Murphy made no examination of young Ball but simply accepted the opinion of one or more persons in the emergency room that young Ball was only drunk and not injured or (2) that Dr. Murphy did examine Ball, diagnosed his condition as being critical and having possible internal in-

juries and yet gave him no supportive treatments of any kind, failed to make any attempt to alert the personnel at John Gaston Hospital of his critical condition and acquiesced in the rough treatment of young Ball by the night watchman and other personnel.

■ The fact that Young Ball was seriously injured and might have died eventually from the ruptured liver does not relieve the hospital of liability if the jury found that the negligence of the intern, Dr. Murphy, hastened the death of young Ball. Spivey v. St. Thomas Hospital, 31 Tenn. App. 12, 211 S. W. (2d) 450; Beech v. Hunter, 14 Tenn. App. 188, 193; Railroad v. Northington, 91 Tenn. 56, 17 S. W. 880; Elrod v. Town of Franklin, 140 Tenn. 228, 204 S. W. 298; Meeks v. Yancey, 43 Tenn. App. 667, 311 S. W. (2d) 329.

It follows therefore that assignment of error No. I must be respectfully overruled.

■ Assignments of error III, IV and V complain of the action of the Trial Judge in refusing to charge defendant's special requests Nos. 1, 2 and 3. We think His Honor the Trial Judge correctly refused to charge special requests Nos. 1 and 2 because said special requests, even though correct statements of the law in the abstract, were not applicable to the evidence in the record.

■ Contents of special request No. 3 were substantially contained in the general charge of His Honor to the jury.

■ Furthermore from our review of the evidence we do not find that the refusals to give any one of the three charges affected the outcome of the trial and therefore an erroneous refusal by His Honor the Trial Judge to charge any one of the requested charges would be at

most harmless error under T. C. A. Section 27-117. Assignments of error III, IV and V are therefore respectfully overruled.

Assignment of error No. VII insists that the court should have set the verdict of the jury aside because the amount thereof indicates that the jury disregarded the court's charge relative to lessening the damage.

On the question of lessening the damages His Honor the Trial Judge charged the jury as follows:

"Now, gentlemen, further on the question of damages, I charge you gentlemen this: If you gentlemen say from the evidence that the deceased would inevitably have died from the injuries from which he was suffering when he was entering the emergency room but find that the defendant was guilty of negligence which directly and proximately hastened the death of the deceased, then you must diminish or reduce the damages according to and in keeping with the expectation of life at the time the defendant's direct and proximate negligent act intervened to hasten the death of the deceased."

We do not find the verdict of the jury so excessive as to require a new trial. Assignment of error No. VII is therefore respectfully overruled.

Assignment of error No. II insists that the verdict of the jury is excessive and so excessive as to indicate passion, prejudice or unaccountable caprice.

Under the provisions of T. C. A. Section 27-119 this court on appeal in error has the prerogative and duty to suggest a remittitur if it deems the verdict excessive even though His Honor the Trial Judge may have

approved the verdict as rendered by the jury and expressly refused to make a remittitur.

As we review the evidence and the verdict of the jury on the question of excessiveness, but still considering the jury as the final judges of the credibility of the witnesses, we are of the opinion that the evidence preponderates in favor of plaintiff's theory that the intern, Dr. Murphy, was guilty of proximate negligence in failing to examine young Ball and in accepting the opinion of other personnel in the emergency room that he was not injured but only drunk and in treating him as such. We think this theory is much more plausible than the theory that Dr. Murphy examined young Ball, decided that he had possible internal injuries and needed hospitalization yet gave him no supportive treatment of any kind and permitted the night watchman and other personnel to rough him up as testified to by plaintiff's witness, Mr. Baker.

The record shows that the deceased was an excellent student of exemplary habits, had never taken any intoxicants and was very active in his church work. However, the fact remains that at the time he entered the Methodist Hospital emergency room he was very seriously injured with a ruptured liver and internal bleeding before any negligence on the part of defendant's employee came into play.

It is true that Dr. Teabeaut testified that young Ball, if given the proper treatment, probably would have lived. We know from human experience that it is also possible that he would not have lived if he had been given the very best treatment available in the City of Memphis immediately upon his being brought to the emergency room. In our opinion the verdict of the jury is excessive

to the amount of $6,000. Accordingly, a remittitur in such amount is suggested.

The assignments of error are all respectfully overruled and the judgment of the lower court as modified is affirmed. A judgment will be entered in this court in the amount of $19,000 together with interest from August 5, 1960, the date the motion for new trial was overruled. The costs of this appeal in error and the court below are taxed against the plaintiff-in-error and the surety on its appeal bond.

Avery, P. J. (W. S.), and Bejach, J., concur.