COURT OF APPEALS OF TENNESSEE

AT KNOXVILLE

FILED

June 2, 1998

Cecil Crowson, Jr.
Appellate Court Clerk

BARBARA J. HAND,            ) HAMILTON COUNTY
Administratrix of Estate    ) 03A01-9704-CV-00123
of Charles D. Hand, Deceased )
                            )
      Plaintiff-Appellee     )
                            )
      v.                     ) HON. ROBERT M. SUMMITT,
                            ) JUDGE
NORFOLK SOUTHERN RAILWAY     )
COMPANY                      )
                            )
      Defendant-Appellant    ) AFFIRMED AND REMANDED

L. HALE HAMILTON and H. DEAN CLEMENTS OF CHATTANOOGA FOR
APPELLANT

PATRICK S. O'BRIEN OF ST. LOUIS, MISSOURI and CLARENCE E. WALKER
OF CHATTANOOGA FOR APPELLEE

O P I N I O N

Goddard, P.J.

This is a suit brought under the Federal Employers

Liability Act. It was brought by Plaintiff Barbara J. Hand,

Administratrix of the estate of her deceased husband, Charles D.

Hand, against his employer, Defendant Norfolk Southern Railway

Company. The jury rendered a verdict in favor of the Plaintiff

and assessed damages in the amount of $3,250,000. The Defendant

appeals, raising nine separate issues. Although many do not merit a protracted discussion, others raise substantial questions.

In the former category it is insisted that the Trial Court was in error in overruling the Defendant's motion for summary judgment and in failing to direct a verdict at the close of the Plaintiff's proof. As to the first point, a trial on the merits precludes consideration of a motion for summary judgment, Cortez v. Alutech, Inc., 941 S.W.2d 891 (Tenn.App.1996), and cases cited therein. As to the second, introduction of evidence by the Defendant waived the motion for directed verdict made at the conclusion of the Plaintiff's proof. Searle v. Bryant, 713 S.W.2d 62 (Tenn.1986).

The other issues may be combined and restated as follows:

1. The Trial Court was in error in not granting a directed verdict at the close of all the proof and in not granting the Defendant's motion for a judgment notwithstanding the verdict because the testimony of the Plaintiff's witnesses as to causation was not admissible.

2. The Trial Court was in error in allowing the Plaintiff to amend her complaint in two respects, first, to allege violation of the OSHA statute because "there was no credible evidence that a violation of the OSHA statute either caused or contributed to

2

the cause of decedent's brain tumor" and, second, to allege aggravation of a pre-existing condition because "there was no credible evidence of a pre-existing condition."

3. The Trial Court was in error in failing to set aside the verdict and grant a new trial because under the competent proof as to damages the award was excessive.

4. The Trial Court was in error in not granting a mistrial because of improper argument of the Plaintiff's counsel.

5. The Trial Court was in error in failing to grant a new trial because the jury's verdict was a product of sympathy, coupled with an erroneous understanding of the Court's charge on loss of enjoyment of life.

Mr. Hand was employed by Norfolk in 1967, and was required to cease his employment in November 1992, when he was diagnosed with a malignant brain tumor, known as glioblastoma multiforme. He died on May 16, 1993, at the age of 58.

During his employment through the years Mr. Hand at various times welded, assisted in insulating and inspecting railroad cars, and engaged in extensive woodworking and carpentry work. During the course of his employment he came in daily contact with certain solvents, such as benzene, xylene, and toluene. He also was exposed to diesel fumes, a herbicide containing triazynes, sealants containing isocyanates, and glue containing benzene.

3

It is one of the Defendant's major contentions that there is no admissible evidence to support a finding that Mr. Hand's exposure to the foregoing substances, many of which are known carcinogens, in any way caused or contributed to the medical condition from which he died.

While we recognize that there is no dearth of testimony from eminent experts supporting the Defendant's contention that Mr. Hand's tumor was not as a result of any exposure to various substances he encountered in the course of his employment. The expert witnesses for the Plaintiff are to the contrary. While there are incidents that the tumor afflicting the Deceased had been found in rats which had been exposed to the substances he had encountered, they concede that they know of no specific instance where such a tumor was caused in humans by any of these materials. Nevertheless, they expressed an opinion that the tumor was caused or contributed to thereby.

A recent opinion of the Supreme Court, McDaniel v. CSX Transportation, Inc., 955 S.W.2d 257 (Tenn.1997), addresses in depth the admissibility of expert testimony as contemplated by Rule 702 and 703 of the Tennessee Rules of Evidence. In McDaniel, which is also a FELA case, it was the contention of the plaintiff that his exposure to certain organic solvents resulted in a form of brain damage known as toxic encephalopathy. On an interlocutory appeal the Supreme Court affirmed the trial judge's admitting the evidence of the plaintiff's experts, and in the

4

course of that opinion made the following observations (at page 263):

## THE TENNESSEE STANDARD

After examining the basic legal principles governing the admissibility of scientific evidence and the change in direction by the federal courts, we turn to Tennessee to clarify our standard of admissibility.

In general, questions regarding the admissibility, qualifications, relevancy and competency of expert testimony are left to the discretion of the trial court. *State v. Ballard*, 855 S.W.2d 557, 562 (Tenn. 1993). The trial court's ruling in this regard may only be overturned if the discretion is arbitrarily exercised or abused. Id. The specific rules of evidence that govern the issue of admissibility of scientific proof in Tennessee are Tenn. R. Evid. 702 and 703. The former provides:

If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

And Tenn. R. Evid. 703 states:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

The plaintiffs contend that the expert testimony in this case is reliable and that it will substantially assist the jury on the issue of causation. The defendant argues that irrespective of *Frye* or *Daubert*, there must be adherence to the strict requirements contained in the language of the rules and also a reasonable standard for proving causation. It contends that the plaintiffs' scientific evidence is unreliable and must be excluded. The defendant argues that an

5

epidemiological study must show a relative risk of greater than 2.0, which several courts have said means that a disease more likely than not was caused by the specific agent or event. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311 (9th Cir.1995), *cert. denied*, ____ U.S. ____, 116 S. Ct. 189, 133 L. Ed. 2d 126 (1995); *Deluca v. Merrell Dow Pharmaceuticals, Inc.*, 791 F. Supp. 1042 (D.N.J.1992), *aff'd*, 6 F.3d 778 (3rd Cir. 1993). As discussed herein, the factor is certainly relevant but we reject the contention that it should be adopted as matter of law.

Although the advisory comments to Rule 702 indicate that Tennessee has followed the *Frye* test in analyzing the admissibility of scientific evidence, one commentator, recognizing the similarity between Tennessee Rule 702 and Federal Rule Evid. 702, has raised the question of whether the *Frye* test of "general acceptance" should be abolished in Tennessee. N. Cohen, S. Sheppeard, and D. Paine, *Tennessee Law of Evidence*, § 401.20 at 124, n. 233. Indeed, as the trial court in this case noted, there is some evidence of a departure from the strict adherence to the *Frye* test by courts in this State.

In our view, determining the standard for the admissibility of scientific evidence requires an analysis of the unique language found in Rules 702 and 703 of the Tennessee Rules of Evidence. For instance, Tenn. R. Evid. 702 requires that the scientific evidence "*substantially* assist the trier of fact," while its federal counterpart requires only that the evidence "assist the trier of fact." Fed.R.Evid. 702. This distinction indicates that the probative force of the testimony must be stronger before it is admitted in Tennessee. *See, e.g.*, Weinstein, *Rule 702 of the Federal Rules of Evidence is Sound; It Should Not Be Amended*, 138 F.R.D. 631, 636 (1991).

Similarly, Tenn. R. Evid. 703 states that "[t]he court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness." There is no similar restriction in the federal rule. Fed.R.Evid. 703. Thus, as one writer has observed, "the additional language . . . [in the Tennessee rule] is obviously designed to encourage trial courts to take a more active role in evaluating the reasonableness of the expert's reliance upon the particular basis for his or her testimony." R. Banks, *Some Comparisons Between the New Tennessee Rules of Evidence and the Federal Rules of Evidence*, Part II, 20 Mem.S.U.L.Rev. 499, 559 (1990). In sum, even though the facts and data need not be admissible, they must be

reviewed and found to be trustworthy by the trial court.

Based on the foregoing analysis, we conclude that Tennessee's adoption of Rules 702 and 703 in 1991 as part of the Rules of Evidence supersede the general acceptance test of *Frye*. In Tennessee, under the recent rules, a trial court must determine whether the evidence will substantially assist the trier of fact to determine a fact in issue and whether the facts and data underlying the evidence indicate a lack of trustworthiness. The rules together necessarily require a determination as to the scientific validity or reliability of the evidence. Simply put, unless the scientific evidence is valid, it will not substantially assist the trier of fact, nor will its underlying facts and data appear to be trustworthy, but there is no requirement in the rule that it be generally accepted.

Although we do not expressly adopt *Daubert*, the non-exclusive list of factors to determine reliability are useful in applying our Rules 702 and 703. A Tennessee trial court may consider in determining reliability: (1) whether scientific evidence has been tested and the methodology with which it has been tested; (2) whether the evidence has been subjected to peer review or publication; (3) whether a potential rate of error is known; (4) whether, as formerly required by *Frye*, the evidence is generally accepted in the scientific community; and (5) whether the expert's research in the field has been conducted independent of litigation.

Although the trial court must analyze the science and not merely the qualifications, demeanor or conclusions of experts, the court need not weigh or choose between two legitimate but conflicting scientific views. The court instead must assure itself that the opinions are based on relevant scientific methods, processes, and data, and not upon an expert's mere speculation. *See, e.g., Joiner*, 78 F.3d at 530. The trial court should keep in mind that the preliminary question under Tenn. R. Evid. 104 is one of admissibility of the evidence. Once the evidence is admitted, it will thereafter be tested with the crucible of vigorous cross-examination and countervailing proof. After that occurs, a defendant may, of course, challenge the sufficiency of the evidence by moving for a directed verdict at the appropriate times. *See* Tenn. R. Civ. P. 50. Yet it is important to emphasize that the weight to be given to stated scientific theories, and the resolution of legitimate but competing scientific views, are matters

appropriately entrusted to the trier of fact. *See Joiner*, 78 F.3d at 534-35 (Birch, J., concurring).

We recognize that the burden placed on trial courts to analyze and to screen novel scientific evidence is a significant one. No framework exists that provides for simple and practical application in every case; the complexity and diversity of potential scientific evidence is simply too vast for the application of a single test. *See Developments in the Law--Confronting the New Challenges of Scientific Evidence*, 108 Harv. L.Rev. 1481, 1513-1516 (1995). Nonetheless, the preliminary questions must be addressed by the trial court, see, Tenn. R. Evid. 104, and they must be addressed within the framework of rules 702 and 703.

APPLICATION OF STANDARD

The trial court correctly foresaw the trend away from *Frye* and also used the factors set forth in *Daubert* as a framework for analysis. As it observed, the scientific theory that exposure to solvents may cause toxic encephalopathy has been tested frequently over a period of 25 years. Because no precise diagnostic device or biological mechanism can isolate the causal factor, the relevant tests have been epidemiological studies. The experts in this case testified at length about the field of epidemiology and the use of cohort and case-control studies. The experts agreed that epidemiological studies have been used to test the hypothesis that exposure to solvents causes encephalopathy and that numerous studies support a causal relationship. These studies have been reviewed, reconstructed, published in leading journals in the field, and subjected to peer review. Although the "positive" studies have been criticized for failing to account for confounding factors, the diagnosis is recognized in medical textbooks and journals as well as by several national and world health organizations. We also observe that the research in this area, including that of several of the plaintiffs' experts, was conducted independently of this litigation.

Accordingly, we agree with the trial court's finding that the evidence will substantially assist the jury to understand the evidence and to determine a fact in issue. We also agree with the trial court's conclusion that the methodology and principles underlying the scientific evidence are sufficiently trustworthy and reliable to be presented to the trier of fact. The trial court is not required to determine whether it agrees with the evidence and should not substitute its view for the trier of fact. It should

allow the jury to consider legitimate but conflicting views about the scientific proof. Provided the evidence is scientifically valid, criticisms of it and opposing views may be elicited on cross examination and/or established in the defendant's case. That is the essence of the lawsuit.

CONCLUSION

We have concluded that the scientific evidence proffered by the plaintiffs satisfies the requirements of Tenn. R. Evid. 702 and 703, and that the trial court did not abuse its discretion in admitting it into evidence.

Our review of the evidence in light of the foregoing, including the reaffirmation of the discretion accorded trial judges in the admission of expert testimony, persuades us that in this case the Trial Judge was correct in finding that the expert witnesses offered on behalf of the Plaintiff met the requirements of Rule 702 and 703 of the Tennessee Rules of Evidence, and that the Trial Court did not abuse its discretion in the admission thereof.

Moreover, as to two of the Plaintiff's expert witnesses, Dr. Allan Lieberman and Dr. Vincent Garry, no timely objection was made at the time their evidence was offered, but, as already noted, even if proper objection had been made, our determination as to the admissibility of their evidence would have been the same.

Before leaving this issue, we have not overlooked the Plaintiff's insistence that no proper objection was made to exclude the evidence and, consequently, its admission may not be

9

made a ground for error. While it appears that as to two of the Plaintiff's experts she may very well be correct, it seems clear to us that as to one, Dr. Girard, an objection was made, although the Plaintiff contends that it was not sufficiently specific.

In reaching our conclusion as to the Defendant's failure to object, we have not overlooked its argument that its motion for a directed verdict made at the close of all the proof puts the admissibility of the evidence at issue. It relies upon McDaniel, supra, as supportive of its position. We do not so read McDaniel, which states, as pertinent to this point, the following (at page 265):

> The trial court should keep in mind that the preliminary question under Tenn.R.Evid. 104 is one of admissibility of the evidence. Once the evidence is admitted, it will thereafter be tested with the crucible of vigorous cross-examination and countervailing proof. After that occurs, a defendant may, of course, challenge the sufficiency of the evidence by moving for a directed verdict at the appropriate times. *See* Tenn. R. Civ. P. 50.

It is our understanding that the foregoing language stands for the proposition that a motion for a directed verdict acts as an objection to the sufficiency of the expert evidence, not to its admissibility.

We now turn to the issues regarding amendments granted to the Plaintiff during the course of the trial. The first issue raised contends that the Plaintiff should not have been allowed

10

to amend to allege OSHA violations because there was no credible evidence that such violations caused or contributed to the Decedent's brain tumor. In light of our disposition of issue one, there is proof from the expert witnesses that the Defendant did violate the Statute, as well as proof that the Decedent's exposure to various chemicals resulting from the violation caused or contributed to the brain tumor.

With regard to the other amendment assailed, the Defendant contends that it was improper because there was no credible evidence of a pre-existing condition. As pointed out in the Plaintiff's brief, Dr. Lieberman, a specialist in occupation and environmental medicine, advanced the concept of individual susceptibility, pointing out that people metabolize substances, particularly poisons, in varying ways, we conclude that the susceptibility of the Decedent was in fact a pre-existing condition justifying the charge.

Finally as to both issues relative to amendments allowed, we point out that the verdict rendered was a general one, as contemplated by T.C.A. 20-9-503, the effect of which was to decide each issue in favor of the Plaintiff if supported by material evidence. General Motors Corporation v. Dodson, 47 Tenn.App. 438, 338 S.W.2d 655 (1960); Rural Educational Association v. Bush, 42 Tenn.App. 34, 298 S.W.2d 761 (1956). Thus, the verdict may stand on the allegations of the original complaint irrespective of the amendments allowed.

The most difficult issue raised in this case, in our view, is the one insisting the award was excessive. Under the substantive Federal law in FELA cases, there are two distinct claims for damages which may be recovered in death cases. The first is pecuniary loss to the survivors, and the second is the loss and suffering sustained by the deceased while he lived. The parties seem to agree that the damages which Mr. Hand was entitled as to the first claim was $227,000 and the balance was to compensate him for his pain and suffering until his death, which occurred approximately seven months after he was diagnosed with the brain tumor.

As to the loss and suffering sustained by the Decedent until his death, there is material evidence to support the following statement in the Plaintiff's brief which we have edited slightly to delete elements we do not believe compensable and to more accurately reflect the record:

> Plaintiff's decedent died as a result of brain cancer. His treating physician, Dr. Cavert McCorkle, described his brain tumor as an especially malignant type called a glioblastoma multiform. There are four grades of gliomas, 1 through 4, and decedent's was a grade 4, the most malignant. It is called a multiforme because it takes different types of physical manifestations, all of which are malignant, all of which are irreversible, and none of which have been found to be successfully treated. Such a tumor can cause brain tissue to degenerate or die, to become necrotic. It can become almost liquefied in certain areas, like mush. Other times, the damaged tissue is firm but abnormal. It can cause various forms of microscopic findings. The presence of the tumor results in swelling or edema, which places pressure on the normal brain. The statistical life expectancy of a person diagnosed with a glioblastoma multiforme is from

12

a couple of weeks to about 6 months, even with surgery. There is no cure for this kind of cancer.

To understand what a person experiences who is diagnosed with a terminal disease, an inoperable brain tumor, and who loses control of their bodily functions, and who must then depend on someone else to assist them with everything, one must appreciate the kind of person he was before the diagnosis. In this case, decedent lived for some seven months after his diagnosis with brain cancer, from November, 1992 until his death in May, 1993, and throughout that time experienced the debilitating effects of his disease. Charles Dean Hand, before his diagnosis of glioblastoma multiforme, was a proud man. He was proud in a calm and not an arrogant way. He was in his work a dedicated man and a master craftsman in all crafts. The assistant manager for defendant at Haynes Shop said that "Charlie Hand was good people," in the sense of being a "good moral person and hard worker." A coworker described him as a detail person, who stressed the importance of doing a job right. He was a mentor to younger workers, and tried to improve the work done at Hayne. He never complained. When things went wrong, he would always try to make them better. His widow, plaintiff Barbara Hand, testified no one ever met him that did not love him and that he never had anything to complain about; that he was happy within his work and his home. He believed in doing things right and good, and that's what he did for the railroad, the very best. He was a religious man who loved his family. Charles Dean Hand, in short, was not a person who was used to being helpless or who expected others to do for him; he was ready to do for them. He was a person who did his part and more, who strove for excellence, and who carried out his responsibilities to others.

He was first diagnosed with a glioblastoma multiforme in November, 1992. He did not seek medical care willingly. His wife and son had to force him into a car after he collapsed on the Sabbath following a full day of work for the railroad, and remained extremely ill on Sunday. His family doctor, Dr. Lovett, saw him that night, and when he had to return to the hospital again the next day, he again had to be forced into the car, claiming he didn't need to go.

After a CT scan and an MRI scan had been obtained, the office of Dr. Cavert McCorkle, a neurologic surgeon, was called for consultation. Dr. McCorkle reviewed the CT and MRI. The scans revealed a very large area of the left frontal part of the brain involved with a tumor, with a lot of swelling (or edema) and degeneration or necrosis, consistent with a

very malignant tumor.  It was deep in the left frontal area, and extended at least to the midline of the brain and was probably growing across the midline.  The location was at the dominant speech center on the left side.  Clinically, he was having speech difficulty and right sided weakness.  He had evident neurologic deficits and was having trouble communicating but was aware.

Dr. McCorkle could not state precisely how long the tumor had been present before the diagnosis.  It could have been there for some length of time, which he quantified as "at least one to two to three months," "smoldering," gradually growing and changing symptomatically, and then developing the malignant tumor.  He has had patients who have been scanned after reporting an abnormality, a seizure or some other complaint, and the scan was read as normal; a brain tumor was not detected on the scan.  Seizures are a characteristic side effect of the presence of the brain cancer.  Then, several months later a gigantic tumor is evident.  Decedent's tumor had certainly been there for some months, probably at least two to three months.  In light of his experience with the patients described above, who have had scans read as normal after having complained of experiencing an abnormality only to reveal a gigantic tumor months later, Dr. McCorkle stated that behavioral changes which the decedent Charles Hand, had experienced in April to May of 1992 were possibly indicative of something related to his cancer going on at that time.

Mrs. Hand testified as to these behavioral changes.  During the year prior to being diagnosed, he became extremely irritable and these changes intensified and became worse through the spring and summer of 1992.

After reviewing the scans, Dr. McCorkle had a long talk with the patient, Charles Dean Hand, and his wife and family, in which it was decided that he would be treated with steroids and radiation, but that surgery would not be attempted.  Dr. McCorkle recommended against surgery because he felt that surgery had nothing to offer his patient and should not be done.  Because the tumor involved the dominant speech center and extended at least to and probably beyond the midline, the chances of actually being able to surgically remove most of the tumor were very remote.  Dr. McCorkle knew from the start he could not get it all out because it was so deep and extended so far, and even if all or most of it could be removed it would grow back.  A grade 4 glioma can grow very quickly.  Statistically, his life expectancy would not be

improved even with surgery and the chances of sustaining significant neurologic loss after surgery were great. The doctor could not justify surgery from a quality of life perspective.

Thus, as the end result of Dr. McCorkle's long talk with the patient, the decedent Charles Hand, and his wife and family, the decision was made by Mrs. Hand to accept Dr. McCorkle's recommendation, and treat with radiation and steroids rather than surgery. The children were against the decision not to do surgery and were very upset with their mother because of this decision. Indeed, Dr. McCorkle testified that the children were unreasonable with him in trying to understand their father's condition, but Dr. McCorkle was steadfast in his belief that ethically surgery had nothing to offer him. And Mrs. Hand testified that after the decision was made against surgery, some of their children reacted in such a way that they didn't come around anymore. Dr. McCorkle's office notes also reflect that Mrs. Hand had reported that the family had been very close but that some of the children were now ignoring him, their father, and were upset with her for not proceeding with surgery.

Decedent was treated with radiation and steroids. The steroids (in this case Decadron) are to reduce the swelling associated with the tumor. The purpose of radiation treatment is to try to shrink or kill the tumor, even though the doctors know that radiation will not cure the tumor, even if undertaken in combination with surgery. The radiation and steroids are an attempt to prolong life and increase the qualify of life the patient has left. The steroids, however, have side effects. On a long term basis, Decadron can cause tissue weakening. It can cause fluid retention and breaking down of the muscles and muscle tissue.

Decedent received two radiation treatments a day during November and December, 1992, for a total of at least 50 treatments. But his condition eventually worsened nevertheless. He experienced seizures even though he was taking anti-convulsive medication. He began to drop everything and started to completely lose control of his right side. After the 37th treatment, he could no longer physically take care of himself. He could not dress or feed himself. He could not control his bowel or bladder functions. He could not control his saliva. He could not walk. He could not sit up straight in a chair; his wife had to hold him up. But he retained awareness and the ability to respond. He could respond to her commands and the questions she asked him; he was very weak but he could always answer her.

15

Dr. McCorkle's examination of decedent in January of 1993 also revealed deterioration. On that day, he was sitting in a chair, and was slumped over in a chair. He could not get around without significant help because of his right sided weakness, and was almost paralyzed on his right side. He was not able to communicate verbally on that day, but could look at you and smile. Dr. McCorkle testified that some patients are aware of the fact that they are losing neurologic function and that in decedent's case, he was aware for at least a while that he could no longer speak appropriately and could no longer use his right side appropriately. Patients such as decedent have good days and bad days; some days they are alert and able to communicate and other days not.

Mrs. Hand, unable to leave him in that condition without trying to do something for him, took him to Mexico for a month from January, 1993 to early February, 1993 for treatment which was not available in the United States. Dr. McCorkle expressed no opinion about the nature of the treatment given in Mexico. He had no objection to Mrs. Hand's decision but would not have recommended such a trip himself out of concern as to whether the patient, in his condition, would survive the trip.

When they arrived in Mexico, decedent could not swallow, could not relieve anything from his system on his own, and could not move. He was dead weight. Following treatment in Mexico, he had some improvement. He reached the point where he could sit in a chair, and swallow and eat. He regained some ability to move his feet and hands, and made attempts to button his clothes. He would attempt to stand or get himself out of the tub when he was bathed. He became able to give his wife some assistance in dressing him, by picking up his feet and putting them in his socks, and with his legs in getting his pants on. Obviously, with this partial recovery of some of his neurologic function, he was still quite limited in what he could do physically and required constant assistance for even the most basic tasks. He required pain medication up until the day he died. Throughout this period, he was able to converse with his wife, and he was responsive to her in their conversations, and revealed in his speech that he was aware of his surroundings, up until his death in May, 1993. Jack Wright, who visited decedent frequently, and who last saw him only two days before his death, also testified that decedent remained coherent and able to converse. Because of his death, decedent was never able to carry out the plans he and his wife had made, that he would work to age 65 and then retire.

16

Charles Dean Hand was a self-reliant, proud man that the evidence show was a family man and a hard worker who was always striving for excellence. He was clearly not accustomed to having to depend on others for help, much less to be rendered helpless and dependent on others for even the most basic physical necessities. Yet, this is what happened to him. At the age of 58 he received a terminal diagnosis, and the advice of a physician that surgery would do him no good. At the same time he received his terminal diagnosis, he also witnessed the agony of his own family and the conflict between his wife and his children about his treatment. It is apparent, and the jury was entitled to find, that witnessing the distress of his family would also cause great mental anguish to the father. Thereafter, some of his children stopped seeing him. The record does not reveal whether he knew his children stopped seeing him over the conflict concerning his treatment. If he did not, the experience of being abandoned by any of his children in the last months of his life without explanation could not have been anything but extremely distressing. If he did know, it could not have been any less distressing. These circumstances, while they clearly show distress on the part of the family, are directly relevant to decedent's own mental distress and anguish between the date of his diagnosis and his death and were properly considered by the jury and argued by plaintiff's counsel on the issue of damages.

During the time following his diagnosis, and for the more than seven months leading up to his death, this proud man lost the ability to control his body, his bladder, and his bowels. He was forced to depend on others to dress and bathe, and for a time, even to eat. For a time he was even unable to control his saliva. He endured a trip to Mexico for treatment that his doctor would not have advised for fear that decedent could not survive the trip. The testimony shows that he remained able to respond to what was said to him by others and to converse with them to the end of his life. In short, he was aware of his gradual decline and his circumstances, and forced to endure his helplessness through this time.

While any determination as to whether an award is excessive, appropriate, or inadequate is for the most part subjective, this Court, nevertheless, under T.C.A. 20-10-103(a) and Smith v. Shelton, 569 S.W.2d 421 (Tenn.1978), is authorized

17

to suggest a remittitur where it finds an award to be "beyond the range of reasonableness."

Under the facts of this case the author of this opinion recognizes that the Decedent suffered severely during his illness and that his family members likewise suffered because of a change in his behavior. Their suffering, however, is not compensable. Upon viewing the whole record and accepting as true the facts quoted from the Plaintiff's brief and the fact that from the date of the inception of the tumor until the Decedent's death was not an extended period, I believe it appropriate to suggest a remittitur in the amount of $1,000,000.

The other members of the panel, however, do not concur in my evaluation, finding that under the facts quoted from the Plaintiff's brief the award by the jury is supported by material evidence.

The Defendant next contends that two separate arguments of counsel for the Plaintiff were both improper and prejudicial, requiring that a new trial be granted. The arguments are as follows:

> I'm very comfortable that you folks will figure that out; that you can come up with a number. Obviously, it's going to have to be a big number, but I don't know what that is and I don't feel comfortable telling you what the value of a human life is. You have to figure that out. That's a heavy, heavy responsibility that you're going to have to determine in this case.

18

MR. HAMILTON: Your Honor, I note an objection.

. . . .

I put up my chart as far as the damages are concerned. Again, 277 is just a starting number. That's what his economic loss is. You have to make a determination on what to award as far as pain and suffering, loss of enjoyment of life, disability, mental anguish, what it did to his family.

As you remember, some of his children basically disowned him after this happened. What a terrible way to spend your last months as close as he was to his family.

Counsel for the Plaintiff contended that no specific objection was made and, consequently, any error emanating therefrom was waived.

We agree with counsel that the words in the first passage quoted, which refers to "the value of a human life" and in the second, which refers to what the Decedent's illness "did to his family" are improper elements of damages. We believe, however, in the context of the entire record and especially in view of the fact that the proper charge as to damages was given by the Trial Court, the error was harmless as contemplated by Rule 36 of the Tennessee Rules of Appellate Procedure.

The last issue contends that two jurors, as shown by post-trial affidavits misunderstood the charge of the Court relative to loss of enjoyment of life and equated it with loss of life, and that this misunderstanding would entitle the Defendant to a new trial. This point is also made under the issue relative

19

to the amount of the award.  We are satisfied, however, that the affidavits of the jurors are inadmissible under Rule 606 of the Tennessee Rules of Evidence as construed by <u>Caldararo v. Vanderbilt University</u>, 794 S.W.2d 738 (Tenn.App.1990).

For the foregoing reasons the judgment of the Trial Court is affirmed and the cause remanded to the Circuit Court for Hamilton County for collection of the judgment and of costs below.  Costs of appeal are adjudged against the Defendant and its surety.

_____
Houston M. Goddard, P.J.

CONCUR:


___(Separate Opinion)_____
Herschel P. Franks, J.


___(Separate Opinion)_____
Charles D. Susano, Jr., J.

21

COURT OF APPEALS OF TENNESSEE

AT KNOXVILLE

FILED

June 2, 1998

Cecil Crowson, Jr.
Appellate Court Clerk

BARBARA J. HAND,                ) HAMILTON COUNTY CIRCUIT COURT
Administratrix of Estate        ) C/A NO. 03A01-9704-CV-00123
of Charles D. Hand, Deceased,   )
                                )
        Plaintiff-Appellee,     )
                                )
                                )
v.                              )
                                )
                                )
                                )
NORFOLK SOUTHERN RAILWAY        )
COMPANY,                        )
                                ) HONORABLE ROBERT M. SUMMITT,
        Defendant-Appellant.)   ) JUDGE


S E P A R A T E   O P I N I O N


Susano, J.

I write separately to explain my differences with Judge Goddard regarding the issue of damages. I concur fully in his treatment of the other issues.

The amount of damages to which a claimant is entitled "is primarily a question for the jury." *Karas v. Thorne*, 531 S.W.2d 315, 317 (Tenn.App. 1975). *See also* *Crutcher v. Davenport*, 401 S.W.2d 786, 787 (Tenn.App. 1965). Once a jury's verdict is approved by the trial judge, it is "entitled to great weight" on appeal. *Karas* at 317. *See also* *Foster v. Amcon International, Inc.*, 621 S.W.2d 142, 143 (Tenn. 1981) ("Our appellate courts have consistently held that the amount of compensation in a personal injury case is primarily for the jury, and that next to the jury, the most competent person to pass on the matter is the trial judge who presided at the trial and heard the evidence.")

When a trial judge approves a jury's award of damages, "the review in the Court of Appeals is subject to the rule that if there is any material evidence to support the award, it should not be disturbed." *Ellis v. White Freightliner Corp.*, 603 S.W.2d 125, 129 (Tenn. 1980). *See also* *Poole v. Kroger Co.*, 604 S.W.2d 52, 54 (Tenn. 1980).

The Court of Appeals has the statutory authority to "first suggest[]" a remittitur. *See* T.C.A. § 20-10-103(a). *See also* *Methodist Hospital v. Ball*, 50 Tenn.App. 460, 362 S.W.2d 475, 488 (1961). However, we are without authority to "first suggest[]" a remittitur if there is found in the record material

24

evidence to support the jury's verdict approved *in toto* by the trial judge.  Rule 13(d), T.R.A.P.  ("Findings of fact by a jury in civil actions shall be set aside only if there is no material evidence to support the verdict.")  If there is material evidence to support the jury's award as approved by the trial judge, we are constitutionally precluded from substituting our judgment for that of the jury.  *See* Amendment 7 to the Tennessee Constitution.

I must disagree with Judge Goddard's general observation that "any determination as to whether an award is excessive, appropriate, or inadequate is for the most part subjective."  While I recognize that such decisions are made by human beings and not computers, I believe that a court should strive to set aside its own predilections and orientation so that it can *objectively* review a jury's award.  I acknowledge that this is not easy; but I believe the goal must be to determine the *objective* reasonableness of the jury's award in light of the evidence and reasonable inferences in the record supporting the jury's verdict.

Our review is well-described in the case of ***Southern Railway Company v. Sloan***, 407 S.W.2d 205, 209 (Tenn.App. 1965):

> We have pointed out repeatedly that in reviewing a case on appeal, where the appeal is from a judgment based on a jury's verdict, we do not weigh the evidence to determine the preponderance thereof, nor do we decide the credibility of witnesses.  ***McAmis v. Carlisle***, 42 Tenn.App. 195, 300 S.W.2d 59.  Our review is limited to a determination of whether there is any material evidence to support the verdict, and "it [our review] must be governed by the rule, safeguarding

25

> the constitutional right of trial by jury, which requires us to take the strongest legitimate view of all the evidence to uphold the verdict, to assume the truth of all that tends to support it, to discard all to the contrary, and to allow all reasonable inferences to sustain the verdict." ***D. M. Rose & Co. v. Snyder***, 185 Tenn. 499, 206 S.W.2d 897. And if there is material evidence to support the verdict it must be affirmed. ***City of Chattanooga v. Ballew***, 49 Tenn.App. 310, 354 S.W.2d 806, and numerous cases there cited.

In the instant case, the material evidence accredited by the jury establishes that the defendant's culpable conduct caused Mr. Hand to suffer from a malignant brain tumor. The deceased underwent some 50 radiation treatments within a short period of time. He experienced seizures. He reached a point where he could not physically take care of himself. On some days he could not communicate. Although he regained some of his neurologic function, he was severely limited in what he could do.

From the time of his diagnosis in November, 1992, until his death on May 16, 1993, the deceased lived from day to day with the almost certain knowledge that his condition was terminable. He was essentially locked inside a body that was slowly decaying to death. He went from being a self-reliant, proud man to a state of helplessness, totally dependent on others for care.

When I view this evidence -- as more fully set forth in Judge Goddard's opinion -- after setting aside my personal predilections, I cannot say that there is no material evidence to support the jury's award of $3,250,000. In other words, viewing

26

the evidence objectively, I believe there is material evidence to support the verdict.

Our Constitution gives litigants the right to a jury trial.  I believe great deference must be shown to a jury's verdict approved by the trial judge.  To do otherwise is to infringe upon our founding fathers' faith in the jury system, as expressed in the foundation document of this State's law.

I am authorized by Judge Franks to express his concurrence with the thoughts expressed in this separate opinion.


_____
Charles D. Susano, Jr., J.

27