ESTATE OF JANE DOE and JOHN DOE,    )
    )
        Plaintiffs/Appellants,    )    Appeal No.
    )    01-A-01-9609-CV-00429
v.    )
    )    Davidson Circuit
VANDERBILT UNIVERSITY, INC.    )    No.    90C-4158
dba VANDERBILT UNIVERSITY    )
MEDICAL CENTER,    )
    )
        Defendant/Appellee.    )

**FILED**

**May 30, 1997**

**Cecil W. Crowson**
**Appellate Court Clerk**

COURT OF APPEALS OF TENNESSEE

MIDDLE SECTION AT NASHVILLE

APPEAL FROM THE CIRCUIT COURT FOR DAVIDSON COUNTY

AT NASHVILLE, TENNESSEE

THE HONORABLE HAMILTON V. GAYDEN, JR., JUDGE

ABBY R. RUBENFELD
Rubenfeld & Associates
2505 Hillsboro Road, Suite 201
Nashville, Tennessee  37212

A. BRUCE JONES
PATRICIA DEAN
Holland & Hart
555 17th Street, Suite 3200
P. O. Box 8749
Denver, Colorado  80201
    ATTORNEYS FOR PLAINTIFFS/APPELLANTS

JOHN S. BRYANT
Bass Berry & Sims
2700 First American Center
Nashville, Tennessee  37238-2700
    ATTORNEY FOR DEFENDANT/APPELLEE

REVERSED AND REMANDED

SAMUEL L. LEWIS, JUDGE

# OPINION

In August of 1984, Jane Doe was transfused with blood contaminated with human immunodeficiency virus (HIV) at Vanderbilt University Medical Center. Years later, she and her husband John Doe sued Vanderbilt University d/b/a Vanderbilt University Medical Center (Vanderbilt) for its failure in 1987 and 1988 to individually notify former patients who had received blood transfusions prior to March 1985 that the blood they received was not tested for the HIV virus. Finding this case to be governed by the provisions of the Tennessee Medical Malpractice Act, Tennessee Code Annotated § 29-26-115[1], the Davidson County Circuit Court concluded that, absent expert testimony that Defendant deviated from the recognized standard of acceptable professional practice for hospitals in Nashville or similar communities, there existed no genuine issue of material fact. The court thus determined that the defendant was entitled to summary judgment.

The sole issue in this appeal is whether Vanderbilt's failure to notify these patients was a medical decision subject to the provisions of the Tennessee Medical Malpractice Act. We find that it was not. Accordingly, we reverse the decision of the trial court and remand this case to the trial court for consideration of its merits.

The facts surrounding this case are not in dispute. Following the elective jaw surgery during which Jane Doe received the contaminated blood, she was never informed that she had undergone a blood transfusion. Nor was she later informed that she was at risk of having been infected by HIV. Subsequently, while unaware of these facts or of her condition, Ms. Doe became romantically involved and eventually married plaintiff John Doe in February of 1989. It was only

---

[1]Tennessee Code Annotated section 29-26-115 (a)(1) provides that medical malpractice claimants prove the defendant failed to act with ordinary and reasonable care in accordance with "[t]he recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which he practices or in a similar community at the time the alleged injury or wrongful action occurred." Furthermore, a medical malpractice plaintiff's expert proof is subject to the following restriction:

> No person in a health care profession requiring licensure under the laws of this state shall be competent to testify in any court of law to establish the facts required to be established by subsection (a) unless he was licensed to practice in the state or a contiguous bordering state a profession or specialty which would make his expert testimony relevant to the issues in the case and had practiced this profession or specialty in one of these states during the year preceding the date that the alleged injury or wrongful act occurred. This rule shall apply to expert witnesses testifying for the defendant as rebuttal witnesses. The court may waive this subsection when it determines that the appropriate witnesses otherwise would not be available.

*Id.* § 29-26-115 (b).

later that year after giving birth to a daughter who had been infected with the virus in utero that Ms. Doe learned of her condition. The Does' infant daughter died of Acquired Immune Deficiency Syndrome (AIDS) shortly after her birth in 1989. Subsequent to the initiation of this law suit, Ms. Doe also died of AIDS.

As stated, the plaintiffs' claim arises out of Vanderbilt's failure in 1987 and 1988 to individually notify patients who had received blood transfusions prior to March 1985 that the blood they received had not been tested for the HIV virus. Vanderbilt admits that it did not search its records to provide notice to these transfusion recipients. Vanderbilt presented the affidavits of several medical experts who were licensed to practice in Tennessee or a contiguous state and who all opined that Vanderbilt acted with ordinary and reasonable care in accordance with the recognized standard of acceptable professional practice in the profession. *See* Tenn. Code Ann. § 29-26-115 (1980).

Experts for the defense stated that Vanderbilt participated in the "Look-Back Program" instituted by the American Red Cross in the summer of 1986--a program developed to identify, locate, and notify any patient who had received blood from a donor later found to have HIV. In addition, in 1987, Vanderbilt established a telephone bank to receive calls from concerned patients. Further, Vanderbilt established procedures for contacting physicians of patients who called, and it offered free HIV testing to any caller who had been transfused at the Hospital from 1978 to spring 1985. In so doing, it was the opinion of these experts that Vanderbilt made a reasonable effort to notify patients who might have received HIV-infected blood prior to 1985 of the risks of possible HIV-infection, and that these measures equaled or exceeded those undertaken by other reputable hospitals in Nashville or similar communities under similar circumstances.

The plaintiffs designated certain experts on their behalf, one of whom was Dr. Marcus Conant, a California physician who had treated more than 5,000 patients with AIDS and who had chaired the California State Department of Health Services Task Force on AIDS from 1983 to 1988. In Dr. Conant's affidavit, he asserted that "testing was critical for those transfusion recipients who were sexually active and/or contemplating a change in their lifestyle, such as becoming pregnant or

acquiring a new sexual partner." In the fall of 1987, various California hospital decided to notify prior transfusion recipients about the risk of AIDS. He stated that relying on general publicity was ineffective as some did not see the news reports and others were unaware that they had been transfused. He opined that the growth of transfusion-associated AIDS in Tennessee made it imperative that transfusion recipients consider HIV testing and that the failure to implement a policy for the notification of these recipients was unreasonable. In addition to Dr. Conant's testimony, Plaintiffs presented a signed statement of Roger Williams, the Chief of Pediatric Pathology at Children's Hospital in Oakland, California. Dr. Williams stated that Children's Hospital had adopted a notification policy pursuant to his recommendation. He added that "[t]he decision to implement a notification program did not require the exercise of specialized knowledge or the practice of medicine. Ultimately, the decision at Children's Hospital was made by a member of the administration who is not a physician. This was appropriate since the notification program was, in essence, an administrative policy."

The record contains evidence concerning the manner in which Vanderbilt arrived at the decision not to implement a policy of notification. To determine whether Vanderbilt needed to adopt the "Look-Back" program, it had formed an ad hoc committee to consider the issue. The committee was made up of representatives from several different departments including pediatrics, hematology, hospital administration, as well as the legal department. The next issue to arise was whether to notify every person who had received blood prior to the advent of the HIV antibody test about the need to consider testing, regardless of whether an HIV positive donor had been identified. Sometime between 1987 and 1989,[2] several informal meetings were held between Dr. Charles Wallas, the hospital blood bank director, along with Dr. William Schaffner, a professor and Chairman of the Department of Preventive Medicine, and Dr. Allen Kaiser, also of the Vanderbilt Medical School. These doctors discussed the issue of notification in order to make a recommendation regarding the implementation of a policy. The doctors could not remember who initiated these meetings or to whom they reported their recommendation. Dr. Schaffner recalled that an attorney from Vanderbilt was also present during some of the discussions.

---

[2]The doctors were not able to agree on the exact time period that they met to consider notification.

It was Dr. Schaffner's testimony that, at their first meeting, they agreed not to consider the administrative complexities or the costs associated with a notification program as these were issues outside of their purview. Instead, as Dr. Schaffner testified, the committee examined the issue from a medical perspective. Dr. Wallas' testimony reveals that they made their decision after a risk/benefit analyses concluding, as Dr. Wallas stated, "there would likely be very little, if any, benefit [in that it was unlikely they would identify infected persons] and a lot of potential risk in terms of the damage we might do by upsetting a large number of patients." A main reason for the doctors' skepticism about a notification program was that the Nashville community was at a low risk of acquiring AIDS through blood transfusions and thus notification was not likely to turn up many cases. They also considered the lack of need for notification given the publicity about AIDS transfusions. As for the risks, the committee expressed concern that notification would be emotionally upsetting. The doctors worried about people misinterpreting the significance of notification and about the number of false positive tests which were common during this time of testing. Dr. Wallas stated that another basis for the doctors' conclusion was that there was no consensus in the country for implementing this type of notification program.

In the defendant's Motion for Summary Judgment and Renewed Motion to Dismiss, it offered in support of its argument the affidavit of a Dr. Sherman, the former chief of medical services at the American Red Cross in St. Louis, Missouri. Dr. Sherman stated that a notification program "would not only be logistically overwhelming but would also be ineffective and would cause undue hysteria and emotional distress." Also in this motion, the defendant suggested that its relationship with Jane Doe had terminated in asserting that "plaintiffs do not allege the existence of a continuing hospital-patient relationship between the defendant and Jane Doe from 1984 to 1989. . . . Vanderbilt had no contact with its former patient, Jane Doe, following her surgery in 1984, until her admission in the fall of 1989."

The outcome of this case hinges upon whether or not the plaintiffs' cause of action should be characterized as a medical malpractice action. This court has recognized that not every allegation of negligence against a hospital or a doctor is one for medical malpractice. *See, e.g., Pullins v. Fentress County Gen. Hosp.*, 594 S.W.2d 663 (Tenn. 1979) (hospital's alleged failure to keep

-5-

premises free of spiders and other pests judged under ordinary negligence principles); ***Spivey v. St. Thomas* Hosp.**, 211 S.W.2d 450 (Tenn. App. 1947) (hospital's liability for patient's fall from a hospital window treated as an ordinary negligence case). In addition, the Tennessee legislature has previously recognized that "medical malpractice" does not encompass every negligence action brought against a health care provider. In the definition section of Tennessee's now-repealed Medical Malpractice Review Board and Claims Act of 1975, the term "medical malpractice action" specifically excluded "any action for damages as a result of negligence of a health care provider *when medical care by such provider is not involved in such action.*" Tenn. Code Ann. §29-26-102(6) (1980) (repealed 1985) (emphasis added).

Recent Tennessee case law further clarifies what is the essence of a medical malpractice action. In ***Peete v. Shelby County Health Care Corp.***, 938 S.W.2d 693, 696 (Tenn. App. 1996), the plaintiff "alleged that she was injured when an employee of Defendant attempted to dismantle an orthopedic suspension bar, which was not in use at the time, and allowed a portion of that apparatus to strike her in the head." The court found this alleged act to be a matter of ordinary negligence, not medical malpractice. *Id.* Distinguishing the two types of actions, the court stated as follows:

> Medical malpractice cases typically involve a medical diagnosis, treatment or other scientific matters. The distinction between ordinary negligence and malpractice turns on whether the acts or omissions complained of involve a matter of medical science or art requiring specialized skills not ordinarily possessed by lay persons or whether the conduct complained of can instead be assessed on the basis of common everyday experience of the trier of fact.

*Id.* (quoting ***Graniger v. Methodist Hosp. Healthcare Sys., Inc.***, No. 02A01-9309-CV-00201, 1994 WL 496781 (Tenn. App. Sept. 9, 1994)); ***see also Harvey v. Wolfer***, No. 03A01-9512-CV-00452, 1996 WL 94819, at *2 (Tenn. App. Mar. 6, 1996) (stating that plaintiff's complaint which alleged that the defendant physician was negligent in the manner in which she moved the plaintiff from the examination table and then dropped her sounded more in common law negligence than medical malpractice and finding that the issue of whether plaintiff's injury was sustained as a result of the ordinary negligence or medical malpractice is a disputed issue of fact for the jury).

Other jurisdictions have drawn this distinction between medical malpractice and negligence under more analogous facts. New York's highest court recently addressed the issue of

"whether [a] plaintiff's complaint against a hospital, alleging that the hospital failed to properly safeguard its blood supply from HIV contamination sounds in medical malpractice or negligence for purposes of selecting the applicable Statute of Limitations." *Weiner v. Lenox Hill Hosp.*, 673 N.E.2d 914, 915 (N.Y. 1996). The court began by acknowledging that not every act of negligence toward a patient is medical malpractice. *Id.* at 916. Seeking to determine whether the challenged conduct constituted medical treatment, the court concluded that "[t]he core issue in this case--the adequacy of the Hospital's blood testing and screening procedures--does not implicate questions of medical competence . . . but instead turns on the Hospital's independent duties as a blood collection center." *Id.* The court clarified that "[t]he need for expert testimony signifies only that the technical and scientific nature of the blood-collection process is beyond the ken of the average juror, not that the claim sounds in medical malpractice." *Id.* at 917; *see also J.B. v. Sacred Heart Hosp. of Pensacola*, 635 So.2d 945, 949 (Fla. 1994) (finding that medical-malpractice statute of limitations was not applicable because plaintiff did not allege negligence in "the rendering of . . . medical care or services" where defendant hospital asked patient's brother (the plaintiff) to transport patient to another hospital without notifying the brother that patient had AIDS).

In determining whether Vanderbilt's decision not to implement a policy of notification was "a matter of medical science or art requiring specialized skills not ordinarily possessed by lay persons," we examine the nature of this decision. *Peete*, 938 S.W.2d at 696. As indicated by the testimony of the three doctors who made the recommendation, they explored the issue from a medical risk/benefit perspective. They drew their conclusion not by assessing the risks and benefits to any particular person but by making this assessment with regard to the entire group of those who had received blood transfusions prior to March of 1985. Because the potential benefit of identifying persons with AIDS in a community with a low risk of AIDS was minimal and because the potential risk of emotionally upsetting all those notified was great, the doctors determined that the risks outweighed the benefit to the group at large. We find that this decision is not a "matter of medical science." While the doctors based their decision on data compiled by the medical community that Nashville was a low-risk community for AIDS, this type of information was available and assessable by any person. As for the emotional effects on one confronted with the fact that he or she has been exposed to a deadly disease, this is a matter of common sense. Indeed, even if the emotional

consequences of such notification were to be medically evaluated, the specialized skills needed would be those of a psychiatrist or psychologist and not those of doctors from the hospital's blood bank or preventive medicine department.

Moreover, by presenting evidence that the administrative complexities and costs associated with a notification program were outside of the doctors' purview, the defendant admits that these factors are indeed natural components of such a decision. For regardless of whether these doctors discussed administrative complexities and costs, they are considerations which would and should be a part of a decision to or not to implement a notification policy. The defendant indeed acknowledged this truth when, in its Motion for Summary Judgment and Renewed Motion to Dismiss, it offered in support of its position the testimony of a Missouri doctor that a notification program would be logistically overwhelming as well as ineffective.

It is significant that this was a decision to or not to notify, not to diagnose or to treat. As stated, this court has noted that "[m]edical malpractice cases typically involve a medical diagnosis, treatment or other scientific matters." *Peete v. Shelby County Health Care Corp.*, 938 S.W.2d 693, 696 (Tenn. App. 1996). Two recent Tennessee Supreme Court decisions clearly establish that an action against a health care provider by a non-patient for failing to provide information to safeguard the non-patient third person is not based on medical malpractice, but rather on simple negligence. *Bradshaw v. Daniel*, 854 S.W.2d 865 (Tenn. 1993), involved a negligence action against a doctor for his failure to warn his patient's family about the symptoms and risks associated with the patient's disease. In addressing the defendant doctor's contention that the absence of a physician-patient relationship negates the existence of a duty in this case, the court stated that "[w]hile it is true that a physician-patient relationship is necessary to the maintenance of a medical malpractice action, it is not necessary for the maintenance of an action based on negligence." *Id.* at 870 (footnote omitted). Applying the principles of common law negligence, the court concluded that a duty did exist. *Id.* at 872-73. Likewise, in *Pittman v. Upjohn Co.*, 890 S.W.2d 425, 431-44 (Tenn. 1994), the court utilized principles of common law negligence to analyze the duty of a physician to warn his patient's grandson of the dangerous properties of a drug prescribed to the patient.

-8-

*Bradshaw* and *Pittman* support the conclusion that Plaintiffs' cause of action does not fall within the meaning of medical malpractice. First of all, like these supreme court cases, the case before us is essentially a failure-to-warn case. Vanderbilt made a decision not to warn Jane Doe and the others transfusion recipients that there was a possibility they had been exposed to HIV-infected blood.[3] Secondly, both *Bradshaw* and *Pittman* state that a physician-patient relationship is a necessary element of a medical malpractice action. *Bradshaw*, 854 S.W.2d at 870; *Pittman*, 890 S.W.2d at 431. As Vanderbilt made clear in its Motion for Summary Judgment and Renewed Motion to Dismiss which referred to Jane Doe as a "former patient," Ms. Doe had no relationship with Vanderbilt following her surgery in 1984 until her admission in the fall of 1989. Vanderbilt now finds itself in a position where it is strategically beneficial to claim Ms. Doe as its patient. However, the facts are that the physician-patient relationship which existed when Ms. Doe underwent elective jaw surgery in 1984 had long since ceased by the time that the alleged negligence occurred. In so stating, we note that it is important that Ms. Doe was at one time in a physician-patient relationship with one of Defendant's physicians for this relationship is the basis for Plaintiffs' claims that their injuries were foreseeable to Defendant. *See Bradshaw*, 854 S.W.2d at 872 (concluding "that the existence of the physician-patient relationship is sufficient to impose upon a physician an affirmative duty to warn identifiable third persons in the patient's immediate family against foreseeable risks emanating from a patient's illness").

Finally, we acknowledge that the court in *Peete* stated that not only does medical malpractice typically involve medical diagnosis and treatment but that it also may involve "other scientific matters." *Peete*, 938 S.W.2d at 696. We think that our conclusions regarding the nature of Defendant's decision preclude a finding that Vanderbilt's decision falls within this catchall term of "other scientific matters." As we have stated, Vanderbilt's decision not to implement a notification policy was not "a matter of medical science or art requiring specialized skills." In so holding, we do not dispute that medical expert testimony would be important to assist a jury in

---

[3]The facts of this case were that Ms. Doe did not even know she had been transfused. Therefore, Vanderbilt's decision not to warn encompasses its decision not to notify former transfusion patients of their transfusions. While this aspect of the decision would be significant in assessing Vanderbilt's duty in a determination of the merits of this case, it is not important to the issue of whether Vanderbilt's decision was a medical decision subject to the Medical Malpractice Act.

determining the notification issue on the merits. However, we agree with New York's supreme court that the need for expert testimony does not always signify medical malpractice. ***See Weiner v. Lenox Hill Hosp.***, 673 N.E.2d 914, 917 (N.Y. 1996). Under these facts, we do not think that scientific data and knowledge on which Vanderbilt relied in making the decision indicates that this case sounds in medical malpractice.

For the foregoing reasons, we conclude that Vanderbilt was not engaging in the practice of medicine when it decided in the late 1980's not to implement a policy to notify former patients who had received blood prior to March of 1985 that they had received blood which was not tested for the HIV virus. Thus, the trial court erred in requiring the plaintiffs' expert proof to comply with the Tennessee Medical Malpractice Act and it erred in granting summary judgment to the defendant when the plaintiffs failed to so comply. In light of this error, we reverse the trial court's grant of summary judgment and remand this case to the trial court so that it may be considered on the merits.

_____
SAMUEL L. LEWIS, JUDGE

CONCUR:

_____
HENRY F. TODD, P.J., M.S.

_____
BEN H. CANTRELL, J.