IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
October 17, 2000 Session

# CLYDE HOLT, INDIVIDUALLY AND AS NEXT OF KIN OF CLAUDINE VERNON WALLER v. CITY OF MEMPHIS, ET AL.

**An Appeal from the Circuit Court for Shelby County**
**No. 37503 T.D.     Robert L. Childers, Judge**

---

**No. W2000-00913-COA-R3-CV - Filed July 20, 2001**

---

This is a wrongful death case. The plaintiff called 911 after his mother experienced difficulty breathing and passed out. When the paramedics arrived, the plaintiff's mother had regained consciousness. After examining her, the paramedics told the plaintiff that his mother was not sick enough to be transported to the hospital. The plaintiff asked that his mother be transported to the hospital, but nevertheless signed a form refusing transport to the hospital. A few hours later the plaintiff's mother's condition worsened. When the paramedics returned, they found the mother unconscious, and immediately took her to the hospital. She died seven days later. The plaintiff filed a wrongful death suit, alleging that the paramedics were negligent in not transporting his mother to the hospital on their first run. The trial court found the paramedics negligent and awarded the plaintiff a money judgment. We reverse, holding that the plaintiff was required to establish by expert testimony the standard of care for the paramedics.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Reversed.**

HOLLY KIRBY LILLARD, J., delivered the opinion of the court, in which ALAN E. HIGHERS, J. and DAVID R. FARMER, J., joined.

Marshall L. Gerber, Carmen Graves, and Michelle L. Betserai, Memphis, Tennessee, for the appellants City of Memphis and Richard Dexter.

Stephen R. Leffler, Memphis, Tennessee, for the appellee Clyde Holt.

**OPINION**

This is a wrongful death case. On February 19, 1990, paramedics Richard Dexter and Christopher Newsom ("Dexter," "Newsom" and collectively "the paramedics") responded to a 911 call from the home of the decedent Claudine Vernon Waller ("the decedent"). Plaintiff/Appellee Clyde Holt ("Holt"), the decedent's son, placed the 911 call because his mother had passed out. She had been coughing heavily and experiencing difficulty breathing and was discharging a brown fluid

from her mouth. The decedent suffered from kyphoscoliosis[1] and emphysema, had a tracheotomy, and required oxygen equipment to aid in her respiration. She was 56 years old.

When the paramedics arrived, the decedent was conscious and sitting up in her bed. The paramedics examined her and determined that her vital signs were normal and that her breathing was not labored. The paramedics asked the decedent whether she wanted to be taken to the hospital. She declined. They presented the decedent with a form refusing transportation to the hospital, and she indicated that she wanted Holt to sign the form. Holt signed the refusal to transport form, and the paramedics left.

It is undisputed that the decedent declined transport to the hospital and that Holt, at his mother's direction, signed the refusal to transport form. However, the parties dispute the events that led to the paramedics not transporting the decedent to the hospital during their first run. The parties dispute first whether the decedent was alert and oriented at the time of the paramedics' first run. Holt's grandmother Maggie Waller ("Mrs. Waller"), was present during the paramedics' visit. Holt and Mrs. Waller assert that, although the decedent was conscious, she was disoriented and nonverbal. Holt testified that his mother groaned as she breathed, her head hung down, and she seemed limp. He said that his mother was unable to sign the form refusing transport because she was disoriented. He said that his mother did not verbally ask him to sign the form, but pointed to him and nodded when the paramedics asked her whether she wanted Holt to sign the form. On the other hand, Dexter, one of the paramedics, testified that the decedent was alert and oriented during the first visit. The paramedics noted on their run ticket that the decedent was conscious, alert and oriented at the time of the first visit. Dexter said that the decedent responded to questions asked of her either verbally or by using her hands and body to indicate her answer. Dexter testified that the decedent, when asked if she wanted to be taken to the hospital, "said no, she wanted to go back to sleep."

The parties also dispute the circumstances surrounding Holt's signing of the form refusing transport to the hospital. Holt acknowledged that the paramedics asked his mother whether she wanted to be taken to the hospital and that she "shook her head no" in response to their question. However, Holt said that he told the paramedics that she did not realize what she was saying and that she needed to be transported. Holt testified that, despite his insistence that his mother be transported, the paramedics repeatedly told him that they did not believe that she was sick enough to be taken to the hospital. Holt's grandmother, Mrs. Waller, also testified that Holt repeatedly asked the paramedics to take his mother to the hospital and that the paramedics responded by saying that she was not sick enough to go. Holt asserted that the paramedics acted as though they were in a hurry to get to another run and told him that they needed to get back to service. Holt testified that he felt coerced into signing the refusal to transport form. He said that he believed that they were not going to transport his mother since they had told him they had another run, and because they had begun to

---

[1]Kyphoscoliosis is a combination of two thoracic deformities: Kyphosus, a posterior curve of the spine (hunchback) and Scoliosis, a lateral curve of the spine. When these spinal deformities occur together they may cause significant physical deformity as well as cardiorespiratory problems if the deformity is severe enough.

pack up their equipment, preparing to leave. Holt asserted that despite his signing the form, he was still concerned about his mother's condition after the paramedics left.

In contrast, Dexter testified that Holt voluntarily signed the form refusing transport. Dexter said that the paramedics, not Holt, brought up the subject of whether the decedent wanted to go to the hospital. He testified that Holt responded to their inquiries by telling them that his mother had just had phlegm build up and was now okay. Dexter maintained that neither he nor Newsom told Holt that he needed to sign the form refusing transport because they had another run to make. Dexter asserted that they did not have another run to make at the time and it is not policy to abandon one run for another.

Two to four hours after the paramedics left, the decedent's condition began to worsen. She again began coughing heavily, had difficulty breathing, and discharged fluid from her throat. She eventually passed out. Holt again called 911. The same paramedics responded to this call. As soon as they arrived, the paramedics again examined the decedent, but this time determined that her vital signs were poor and her breathing was labored. The decedent briefly regained consciousness, but quickly lost consciousness and never regained it. As the paramedics transported Holt's mother to the hospital, she went into cardiorespiratory arrest and they began resuscitation efforts. The resuscitation efforts continued when they arrived at the hospital. Holt's mother was eventually placed on a ventilator. She died seven days later.

On February 18, 1991, Holt filed suit against the paramedics and the City of Memphis[2] ("the City"), alleging that the paramedics were negligent and reckless in not transporting the decedent to the hospital on their first run. He contended that the paramedics' negligence resulted in his mother's death.

A bench trial was held. Holt testified at the outset of the trial. Holt testified that, despite his insistence that his mother be taken to the hospital, the paramedics repeatedly told him that she was not ill enough to be transported. Holt said that he reluctantly signed the form refusing transport because he felt that the paramedics would not take his mother to the hospital, despite his insistence, based on the paramedics' demeanor, their actions, and their statement that they needed to get back to service. He maintained that, during the paramedics' first run, his mother, though conscious, was disoriented and consequently could not sign the form refusing transport.

One of the paramedics, Dexter, also testified at the trial. Dexter said that the decedent's vital signs and breathing were normal at the time of the first run. He testified that, when asked whether

<hr>

[2]The Memphis Fire Department, Newsom, and the driver of the ambulance were also named in the suit. However, Newsom had left the employ of the Memphis Fire Department and moved to Texas before the suit was filed. He was not served with process and did not testify at trial. During trial and without objection from the plaintiff, the trial judge dismissed the Memphis Fire Department as a party to the suit. The complaint also lists a John Doe ambulance driver; however, the record does not indicate that he was identified or served with process; he is not listed in the trial court's order or in the notice of appeal.

she wanted to go to the hospital, the decedent declined and indicated that Holt should sign the form refusing transport to the hospital.

The decedent's treating physician, Dr. Richard Boswell ("Dr. Boswell") also testified, by deposition. Dr. Boswell testified that the primary cause of death was cardiorespiratory arrest.[3] He opined that, had the decedent been transported to the hospital earlier in the day, she would not have gone into cardiorespiratory arrest. He stated that her kyphoscoliosis was a manageable chronic condition and that, had she arrived at the hospital in time to receive proper treatment, there was nothing about her condition to indicate that she would not have continued to live. Dr. Boswell admitted that he could not discern how much longer the decedent could have lived. He said that the fact that the decedent's vital signs were within normal range was not determinative as to whether she should have been transported to the hospital. He said that, although vital signs are an important guide, determining whether the patient's breathing is labored is essential to ascertain whether the patient is in respiratory distress. He stated that a trained observer is generally better than an untrained observer at discerning whether a person is having difficulty breathing and that a paramedic should be such a trained observer. The parties stipulated that Dr. Boswell was not an expert as to paramedics' procedure on when a patient should be transported to the hospital, as to the standard of care for paramedics or as to whether the paramedics violated procedure by not transporting the decedent to the hospital on their first run. Dr. Boswell testified that he never "intended to say" that the paramedics "should have" transported the decedent at the time of the first run, only that, had she come to the hospital earlier she would not have gone into respiratory arrest.

Dr. Kevin Merigian ("Dr. Merigian"), Medical Director of the Memphis Fire Department and City of Memphis paramedics, testified for the defendants as an expert as to the standard of care for a paramedic. Dr. Merigian wrote or edited the majority of the protocols and guidelines used by the Fire Department. He testified that, after reviewing the paramedics' run sheets from the two visits as well as Dr. Boswell's deposition testimony, he believed that the paramedics did not deviate from the standard of care and acted appropriately in not transporting the decedent during the first run. Dr. Merigian testified that when a patient refuses transport, the paramedic cannot force the patient to go. Instead, the paramedic may either call MedCom to talk to a physician or leave the scene after assessing the patient's physiologic and mental condition. He felt that, in this case, the paramedics acted appropriately in not transporting the decedent, based on the decedent's vital signs; the paramedics' assessment of the decedent's physical state, including the fact she was conscious and alert, that she did not appear to the paramedics to be in any distress, and that her breathing did not appear labored; her desire not to be transported to the hospital; and Holt's signature on the form refusing transport to the hospital. Dr. Merigian testified that the paramedics were trained to ascertain if a patient's breathing was labored. He said that it was not unusual for paramedics not to mark every section of the medical survey on the run sheet when doing a patient examination. He

_____

[3]Dr. Boswell testified that the decedent's cardiorespiratory arrest lead to brain death, by cutting off oxygen to her brain . He stated that an EEG done a week after the decedent was admitted showed no evidence of brain function and that, after discussion with her family, he disconnected the decedent from the ventilator.

maintained that, unless there was a problem present or an indication of an abnormality in the area listed on the run sheet, leaving a section unmarked was not a cause for concern. Dr. Merigian asserted that, in his opinion, there was no way to predict that the decedent would go into cardiorespiratory arrest, considering that, at the time of the paramedics' first run, her vital signs were normal and there was no indication that her breathing was labored.

At the conclusion of the trial, the trial court issued an oral ruling. The trial court found that the paramedics had failed to comply with the requirements of Tennessee Code Annotated § 68-140-501, et seq. and the general rules promulgated by the Emergency Medical Service Board ("the Board"), specifically Rule 1200-12.1.04(3)(a), which requires a paramedic to conduct a complete assessment of the patient's medical condition. The trial court stated that the paramedics' failure to fill out several of the evaluation categories on the run ticket evidenced that the paramedics were in a hurry, too much of a hurry to fill out the form completely. The trial court noted that none of the boxes in the cardiovascular section of the run sheet were checked, including the box labeled "fainting" and that the box labeled "chest" in the section titled "Location of Injury-Illness." The trial court stated that, based on the evidence presented, "the location of the illness was, at least, in the chest." The trial court concluded that the paramedics failed to do a complete evaluation as required by the statute and the rules. It also found that neither Holt nor the decedent knowingly refused transport to the hospital because their decisions were based on the paramedics' faulty information that the decedent was not ill enough to be transported, information which resulted from the paramedics' incomplete evaluation of the decedent. Consequently, the trial court concluded that the paramedics were negligent in failing to transport the decedent to the hospital on the first run, and that this negligence caused her death. The trial court awarded judgment against the City and Dexter in the amount of $76,8000, consisting of $6800 in funeral expenses, $20,000 for pain and suffering, and $50,000 for loss of consortium for the decedent's relationship with her minor son, Vernon Martin. (Tr. at 201) From this decision, the City and Dexter now appeal.

On appeal, the City and Dexter contend, *inter alia*, that the trial court erred in finding that the paramedics committed negligence in not transporting the decedent to the hospital because Holt failed to present any expert testimony as to the paramedics' standard of care or how the paramedics deviated from that standard. They contend that the paramedics' actions complied with the standard of care and the requirements of the statute and general rules because the decedent was conscious alert, oriented, and in no apparent distress at the time of the first run. They also note that the decedent declined transport and that Holt signed the form refusing transport.

Holt argues that the paramedics' actions constituted negligence as a matter of law because their failure to transport was in direct violation of the standard of care established by the rules governing paramedics. He contends that expert testimony was not needed because of the specificity of the statutes and general rules outlining proper paramedic practice and care. He contends that under Rule 1200-12-1-.11(7), he needed only to prove that the decedent was over the age of 55 and had a respiratory disease in order to establish as a matter of law that the paramedics' failure to transport her on the first run was negligent.

The determination of negligence claims is a mixed question of law and fact. **Kelley v. Johnson**, 796 S.W.2d 155, 157-58 (Tenn. Ct. App. 1990)   Therefore, our review of this case is governed by rule13(d) of the Tennessee Rules of Appellate Procedure, which provides that review of findings of fact by the trial court shall be *de novo* upon the record of the trial court, accompanied by a presumption of correctness of the factual findings, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); **Union Carbide Corp. v. Huddleston**, 854 S.W.2d 87, 91 (Tenn. 1993). However, there is no presumption of correctness with regard to the trial court's legal determinations. **See Ball v. Hamilton County Emergency Med. Serv.**, No.03A01-9804-CV-00139, 1999 WL 134686, at *3 (Tenn. Ct. App. Mar. 9, 1999), *perm. to appeal den.* Sept. 13, 1999.

The trial court's conclusion that the paramedics were negligent was based on its finding that they violated both the statute and the Board's rules concerning the examination and transportation of patients. The trial court found that the paramedics' failure to respond to each category listed in the medical survey on the run sheet evidenced that the paramedics were in a hurry and that they failed to conduct a complete evaluation of the patient as required by general rule 1200-12-1-.04(3)(a):

> The EMT shall perform initial patient survey, shall provide emergency care through careful assessment of the patient, and shall recognize injuries and illness. The EMT shall also gain knowledge of preexisting medical conditions, previously prescribed medications, medical preference, and identification of the patient.

Tenn. Comp. R. & Regs. 1200-12-1-.04(3)(a) (1999). The trial court concluded that by failing to conduct a "complete evaluation" as required under the rule, the paramedics also violated Tennessee Code Annotated § 68-140-501 *et seq.*, requiring full compliance with rules promulgated by the Board.[4]

The trial court did not state that its decision was based on the doctrine of negligence *per se*, but we must conclude that it was. Under the doctrine of negligence *per se*, the burden is placed on the plaintiff to prove "that the defendant violated a statute or ordinance which imposes a duty or prohibits an act for the benefit of a person or the public," "that the injured party was within the class

---

[4]Section 68-140-509 outlines the duties and authority of emergency service personnel on the scene:

> Emergency medical services personnel shall exercise the skills and abilities needed to render appropriate emergency medical care and provide emergency medical services in accordance with authorized procedures in the respective level of training, and shall administer care to patients based upon knowledge and application of principles derived from accepted practice and medical approval, and shall fully comply with the [B]oard's regulations governing activities and performance for the category of license or certification.

Tenn. Code Ann. § 68-140-509 (Supp. 2000). Section 68-140-511 further prohibits an EMT or paramedic from violating "any rule or regulation of the [B]oard," failing to "report patient care which accurately reflects the evaluation and treatment of each patient," and "[a]bandoning or neglecting a patient requiring emergency care, following assumption of duty." Tenn. Code Ann. § 68-140-511 (1)(C), (5), (6) (1996).

of persons whom the legislative body intended to benefit and protect by the enactment of that particular statute or ordinance," and "that such negligence was the proximate cause of the injury." *Smith v. Owen*, 841 S.W.2d 828, 831 (Tenn. Ct. App. 1992)(citations and internal quotations omitted). Under Tennessee law, a paramedic has a statutory duty to provide emergency medical services or "services utilized in responding to the perceived need for immediate medical care in order to prevent loss of life or aggravation of illness or injury." *See* Tenn. Code Ann. §§ 68-140-509(a), 68-140-502(11). This duty is measured by the standard of care required of emergency medical service personnel. *Dooley v. Everett*, 805 S.W.2d 380, 384-85 (Tenn. Ct. App. 1990). The scope of the paramedic's duty is question of fact for the trier of fact. *Ball*, 1999 WL 134686 at * 5 (citing *Dooley*, 805 S.W.2d at 384).

In a medical malpractice action, the standard of care, deviation from that standard of care, and proximate cause must be established by expert testimony in any case not within the experience or knowledge of a layman. *Jennings v. Case*, 10 S.W.3d 625, 627 (Tenn. Ct. App. 1999), *perm. to app. den.* Jan. 3, 2000; Tenn. Code Ann. § 29-26-115 (2000). In this case, Holt presented no expert testimony as to the standard of care for paramedics or as to how the paramedics deviated from that standard by not transporting his mother to the hospital on their first run. Holt contends that the statute requiring expert testimony in malpractice actions does not apply to this case because EMTs and paramedics are not subject to the statute in that they are not licensed to practice medicine and are not physicians. He argues that the specificity of the statutes and rules on the parameters of acceptable paramedic practice obviate the need for expert testimony.

In *Mooney v. Sneed*, 30 S.W.3d 304 (Tenn. 2000), our Supreme Curt concluded that an EMT is a "health care practitioner" within the meaning of Tennessee Code Annotated § 29-20-310(b) and is, therefore, not immune from suit for medical malpractice under the Tennessee Governmental Tort Liability Act. *Id.* at 307-08. In determining that an EMT is a health care practitioner within the meaning of the statute, the Court reasoned that "the term 'health care practitioners' must be construed in the context of those individuals who are subject to being sued for medical malpractice." *Id.* Thus, paramedics such Dexter and Newsom are subject to being sued for medical malpractice. Consequently, in a medical malpractice suit against them, Tennessee Code Annotated § 29-26-115 would apply.

Every allegation of negligence against a health care practitioner is not a case of medical malpractice:

> The distinction between ordinary negligence and malpractice turns on whether the acts or omissions complained of involve a matter of medical science or art requiring specialized skills not ordinarily possessed by lay persons or whether the conduct complained of can instead be assessed on the basis of common everyday experience of the trier of fact.

A malpractice case generally involves some type of medical diagnosis, treatment or other scientific matter. *Estate of Doe v. Vanderbilt University, Inc.*, 958 S.W.2d 117, 120 (Tenn. Ct. App. 1997).

-7-

In this case, the heart of the plaintiff's case is that the defendant paramedics failed to appropriately assess the decedent's condition and consequently did not believe it was necessary to transport her to the hospital. The paramedic's assessment of a patient's medical condition and determination of whether there is a need to transport the patient to the hospital, based on that assessment, clearly involves matters of medical science or specialized skill. Paramedics receive specialized training in order to assess patients' medical needs and determine whether to provide medical care. *See Mooney*, 30 S.W.3d at 307; Tenn. Code Ann. § 68-140-509(a). Therefore, this case must be characterized as a medical malpractice action to which Tennessee Code Annotated § 29-20-115 would be applicable.

The trial court based its finding of negligence in part on the fact that the paramedics failed to completely fill out the run sheet on the first run, concluding that this violated the complete evaluation requirement of the statute and of Rule 1200-12-1-.04(3)(a). Certainly the fact that the paramedics did not completely fill out the run sheet is evidence that they were in a hurry and is relevant to whether they appropriately assessed the decedent's condition. However, the failure to completely fill out the run sheet did not injure the decedent; it is merely evidence that the paramedics did not exercise due care in assessing the decedent's medical condition. The incomplete run sheet, in and of itself, is not sufficient to establish the standard of care for the paramedics in assessing a patient's condition, particularly in light of the unrefuted expert testimony of Dr. Merigian that it was not unusual for a paramedic not to mark portions of the run sheet if the patient was not experiencing difficulty in that area.

The trial court notes that the portion of the run sheet regarding "fainting" was not marked, and the paramedics were initially called for the first run in part because the decedent had passed out. Again, while this is pertinent to whether the paramedics exercised due care in assessing the decedent, there is no evidence of a specific condition of the decedent that should have been ascertained by the paramedics that would have changed their determination that the decedent did not need to be transported to the hospital.

Holt notes that Rule 1200-12-1-.11(7) of the official compilation Rules & Regulations of the State of Tennessee provides for transport of a patient over the age of fifty-five with a respiratory disease, and argues that this establishes the standard of care, regardless of expert testimony. This Rule states:

(7) Destination Determination - Sick or injured persons who are in need of transport to a health care facility by a ground or air ambulance . . . should be transported according to these destination rules.

* * *

(iv) Step 4. If the results of steps 1, 2, or 3 do not indicate a need to transport the patient to a Level I Trauma Center or a need to contact Medical Control for a triage decision but the patient satisfies any one

of the following, Medical Control should be contacted for the triage decision . . . If Medical Control [is not available] the patient should be transported to the most appropriate facility:

> (I) The patient is older than fifty-five (55) year[s] of age; or
>
> * * *
>
> (III) A patient with a respiratory disease. . . .

Tenn. Comp. R. & Regs. 1200-12-1-.1(7) (1999) Holt argues that this Rule establishes that a patient such as the decedent, fifty-six years old with a respiratory disease, <u>must</u> be transported to the hospital, regardless of whether the patient indicates that she does not wish to be taken to the hospital and regardless of the signed form refusing transport to the hospital. However, local rules and procedures such as Rule 1200-12-1-.11(7) are to be read in conjunction with the Board's rules and the statutory provisions. *See* Tenn. Code Ann. § 68-140-509. The Memphis Fire Department EMS Field Operations Manual provides: "If a patient refuses transport, note the refusal on the incident report form and, if possible, obtain the patient's signature." In his undisputed expert testimony, Dr. Merigian asserted that, once the decedent declines transport, absent extreme circumstances, the paramedic cannot force the patient to go, and indicated that a family member's signature at the direction of the patient was sufficient. This application of the Rule makes sense; in the case of a competent patient over age 55 who refuses to be transported to the hospital, are paramedics to take the patient by physical force by ambulance to the hospital? Dr. Merigian's expert testimony on the application of the Rule in the field and the standard of care for paramedics on this issue was unrefuted in the trial court below.

Holt notes that the evidence in the trial court below, apparently credited by the trial court was that the decedent was disoriented and not competent to decline transport to the hospital. This evidence is important, but again is not relevant to whether Holt established by competent evidence the standard of care for the paramedics.

It must be noted that there was no finding by the trial court that Holt's signature on the refusal to transport form was coerced or involuntary. Rather, the trial court found that Holt was not adequately informed before signing the form, because the paramedics' assessment of his mother's condition was faulty and incomplete. This relates again to whether the paramedics appropriately assessed and diagnosed the decedent's condition, an issue for which the standard of care must be established by expert testimony. Thus, under all of these circumstances, evidence that the paramedics failed to transport the decedent to the hospital, in the absence of expert testimony that the failure to do so breached the applicable standard of care, is insufficient to support a judgment against the defendants. Accordingly, the trial court's judgment against the defendants must be reversed.

The decision of the trial court is reversed.  Costs on appeal are taxed to the appellee Clyde Holt and his surety, for which execution may issue if necessary.

_____

HOLLY K. LILLARD, JUDGE